## HYSLER *v.* FLORIDA.

No. 64. Argued December 12, 1941.—Decided March 2, 1942.

*Mr. Carlton C. Arnow,* with whom *Mr. P. Guy Crews* was on the brief, for petitioner.

*Mr. Joseph E. Gillen,* Assistant Attorney General of Florida, with whom *Messrs. J. Tom Watson,* Attorney General, and *Woodrow M. Melvin* were on the brief, for respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

After the Supreme Court of Florida had affirmed his conviction for murder, the petitioner applied to that court for leave to ask the trial court to review the judgment of conviction. The basis of his application was the claim

that the testimony of two witnesses implicating him was perjured, and that they had testified falsely against him because they were "coerced, intimidated, beaten, threatened with violence and otherwise abused and mistreated" by the police and were "promised immunity from the electric chair" by the district attorney. After twice considering the matter, the Supreme Court of Florida denied the application. 146 Fla. 593, 1 So. 2d 628. We brought the case here, 313 U. S. 557, in view of our solicitude, especially where life is at stake, for those liberties which are guaranteed by the Due Process Clause of the Fourteenth Amendment.

The guides for decision are clear. If a state, whether by the active conduct or the connivance of the prosecution, obtains a conviction through the use of perjured testimony, it violates civilized standards for the trial of guilt or innocence and thereby deprives an accused of liberty without due process of law. *Mooney* v. *Holohan,* 294 U. S. 103. Equally offensive to the Constitutional guarantees of liberty are confessions wrung from an accused by overpowering his will, whether through physical violence or the more subtle forms of coercion commonly known as "the third degree." *Brown* v. *Mississippi,* 297 U. S. 278; *Chambers* v. *Florida,* 309 U. S. 227; *Lisenba* v. *California,* 314 U. S. 219. In this collateral attack upon the judgment of conviction, the petitioner bases his claim on the recantation of one of the witnesses against him. He cannot, of course, contend that mere recantation of testimony is in itself ground for invoking the Due Process Clause against a conviction. However, if Florida through her responsible officials knowingly used false testimony which was extorted from a witness "by violence and torture," one convicted may claim the protection of the Due Process Clause against a conviction based upon such testimony.

414

And so we come to the circumstances of this case.

On November 25, 1936, as a result of an attempted robbery, John H. Surrency and his wife, Mayme Elizabeth, were murdered. On December 16, 1936, Hysler was indicted for the murder of John Surrency; he was tried on January 21, 1937, was convicted on February 12, 1937, with recommendation of mercy, and was thereafter sentenced to imprisonment for life. On February 3, 1938, his sentence was affirmed by the Florida Supreme Court. 132 Fla. 200, 181 So. 350. The record in the case was more than 3000 pages. On January 15, 1937, Hysler, together with two others, James Baker and Alvin Tyler, was indicted for the murder of Mrs. Surrency. A severance having been granted as to Tyler and Baker, Hysler was placed on trial on March 15, 1937, and on April 5 was found guilty without recommendation of mercy. On April 23, 1937, he was sentenced to death. On April 24 he sued out a writ of error to the state Supreme Court, which on February 3, 1938, sustained the sentence, and on June 3 denied a rehearing. The record on this second trial was some 2500 pages. 132 Fla. 209, 181 So. 354.

Surrency kept a restaurant near Jacksonville, and on the fatal day was returning from one of his regular and well-known trips to that city to get checks cashed. Hysler had known Baker in connection with Hysler's illicit whiskey business. Baker and Tyler were friends. The principal evidence in both trials against Hysler was their testimony. They testified with circumstantiality that Hysler induced them to hold up Surrency, furnished them a car, a pistol, and some whiskey, gave them detailed instructions for carrying out the plan, and by prearrangement was in the vicinity of the place of its execution. While their testimony doubtless was the foundation of Hysler's convictions, the testimony both of numerous witnesses and Hysler himself sheds much confirming light

on the story told by Baker and Tyler. A careful concurring opinion affirming the conviction now challenged concluded thus: "From the evidence it is difficult to see or understand how the jury in the Court below could have rendered a verdict other than guilty. We have thoroughly considered each assignment and failed to find error in the trial of the cause in the lower court." 132 Fla. 209, 235, 181 So. 354, 364.

Accordingly, the date for the execution was set by the Governor of Florida for the week of February 20, 1939. In the meantime, however, an application for a writ of *habeas corpus* by Hysler was made to the Supreme Court of Florida, partly on the ground of insanity. This was denied by that Court on February 20, 1939. 136 Fla. 563, 187 So. 261. Tyler broke jail and has apparently remained a fugitive from justice. Baker was tried after Hysler, was convicted of murder in the first degree, and sentenced to death. His conviction was affirmed by the Florida Supreme Court on March 14, 1939, and a rehearing denied on April 11, 1939. 137 Fla. 27, 188 So. 634.

We have now reached the final chapter of this unedifying story in the administration of criminal justice. On April 10, 1941, more than four years after Hysler's conviction for the murder of Mrs. Surrency, he petitioned the Supreme Court of Florida for permission to apply to the Circuit Court of Duval County, Florida (the court before which he was originally tried), for writ of error *coram nobis*. This common law writ, in its local adaptation, is Florida's response to the requirements of *Mooney* v. *Holohan,* 294 U. S. 103, for the judicial correction of a wrong committed in the administration of criminal justice and resulting in the deprivation of life or liberty without due process. See *Lamb* v. *Florida,* 91 Fla. 396, 107 So. 535; *Skipper* v. *Schumacher,* 124 Fla. 384, 169 So. 58; *Jones* v. *Florida,* 130 Fla. 645, 178 So.

404. In brief, a person in Florida who claims that his incarceration is due to "failure to observe that fundamental fairness essential to the very concept of justice," *Lisenba* v. *California, supra,* at p. 236, even after his sentence has been duly affirmed by the highest court of the State, has full opportunity to have a jury pass on such a claim provided he first makes an adequate showing of the substantiality of his claim to the satisfaction of the Supreme Court of Florida. The decisions of that Court show that a naked allegation that a constitutional right has been invaded is not sufficient. A petitioner must "make a full disclosure of the specific facts relied on," and not merely his conclusions "as to the nature and effect of such facts." The proof must enable the appellate court to "ascertain whether, under settled principles pertaining to such writ, the facts alleged would afford, at least *prima facie,* just ground for an application to the lower court for a writ of error *coram nobis.*" *Washington* v. *Florida,* 92 Fla. 740, 749, 110 So. 259, 262; see *Skipper* v. *Schumacher,* 124 Fla. 384, 405–08, 169 So. 58; *Skipper* v. *Florida,* 127 Fla. 553, 554–55, 173 So. 692. The latest formulation by the Florida Supreme Court of its function in considering an application for leave to apply to the trial court for a writ of error *coram nobis* is found in *McCall* v. *Florida,* 136 Fla. 349, 350, 186 So. 803 (1939): "In the exercise of its discretion in matters of this sort the court should look to the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof. This duty we have met and we are convinced that to grant the petition would be no less than a trifling with justice."

Such a state procedure of course meets the requirements of the Due Process Clause. Vindication of Constitutional rights under the Due Process Clause does not demand uniformity of procedure by the forty-eight States. Each State is free to devise its own way of secur-

ing essential justice in these situations. The Due Process Clause did not stereotype the means for ascertaining the truth of a claim that that which duly appears as the administration of intrinsic justice was such merely in form, that in fact it was a perversion of justice by the law officers of the State. Each State may decide for itself whether, after guilt has been determined by the ordinary processes of trial and affirmed on appeal, a later challenge to its essential justice must come in the first instance, or even in the last instance, before a bench of judges rather than before a jury.

Florida then had ample machinery for correcting the Constitutional wrong of which Hysler complained. But it remains to consider whether in refusing him relief the Supreme Court of Florida denied a proper appeal to its corrective process for protecting a right guaranteed by the Fourteenth Amendment.

Hysler's claim before the Supreme Court of Florida was that Baker repudiated his testimony insofar as it implicated Hysler and that he now named another man as the instigator of the crime. Considering the fact that this repudiation came four years after leaden-footed justice had reached the end of the familiar trail of dilatory procedure, and that Baker now pointed to an instigator who was dead, the Supreme Court of Florida had every right and the plain duty to scrutinize this repudiation with a critical eye, in the light of its familiarity with the facts of this crime as they had been adduced in three trials, the voluminous records of which had been before that Court.[1]

The Florida Supreme Court had before it four affidavits by Baker. The affidavits must be considered here

---

[1] In denying Hysler's application, the Supreme Court of Florida specifically stated that it was taking judicial cognizance of its own records. 146 Fla. 593, 594–95, 1 So. 2d 628.

418

as they were before that Court—in their entirety. One was made on April 7, 1941; the second on April 8 between six and seven in the evening; another between eight-thirty and nine of the same night; the fourth, the next day. The most striking feature of this series of retractions is that, in his first and spontaneous new account of the happenings that led to the murders on November 25, 1936, Baker does not attribute to coercion or inducements made by state authorities his testimony at the trials that Hysler was the instigator of the crimes. On the contrary, according to Baker's new story, after the killing of the Surrencys, Tyler and he "agreed between them while they were in Cracker Swamp in the Marietta section of Duval County, that they would lay the blame of the planning of the robbery of the Surrencys upon Clyde Hysler because they had had considerable liquor dealings with Clyde Hysler and knew him well, and for the reason that the Hyslers bore a bad reputation in Duval County, and for the further reason that Clyde Hysler's father had plenty of money and they thought that by laying the planning of the robbery of the Surrencys on Clyde Hysler that his father and his other relatives would put up sufficient money to get Clyde Hysler out of the trouble and that by laying it on to Clyde Hysler, that he, James Baker, and Alvin Tyler would escape the death penalty . . ."

There is no suggestion whatever in this explanation of what is now claimed to have been a false accusation that it was induced from without. Baker gives five reasons for having fixed the blame on Hysler—an explanation to which he had adhered for more than four years—but all these reasons make Baker and Tyler the spontaneous concocters of the alleged false charge. It was not until the next day, that Baker, under leading questions, suggested that his account of the crime, contemporaneous with it,

was induced by the hope of getting "life instead of the chair."[2] Even in this second affidavit there is no hint that the prosecutor had any knowledge of the falsity of his implication of Hysler.[3] Only after a third session did Baker, in an ambiguous reply to another leading question, convey a suggestion of the prosecutor's knowledge of the use of force preceding Baker's original testimony. This

---

[2] "Q. Then it was a definite promise from Mr. Harrell, the State's Attorney to keep you from burning?

A. He said that he would see that I would get life, but that he would see that I didn't stay at the chain gang but three years.

Q. You say he played off sick to keep from prosecuting you?

A. Yes, sir, Mr. Simpson his assistant and Mr. Hallows prosecuting, the Judge had ordered him to handle the Hysler case straight through, cause Mr. Hollows was not familiar with the case.

Q. Do you know whether or not Mr. Harrell had gone out of office and Mr. Hallows had taken office?

A. Yes, sir, I think he had and that was why the Judge wanted him to carry this thing on through, but I don't be sure.

Q. Is there anything else you want to say along that line about those threats or beatings?

A. No, sir, that is all I can think of right now."

[3] "Q. Now what threats or promises did they make you to testify and implicate Clyde Hysler?

A. Well, Mr. Griffen and them didn't, they didn't make no promises, Mr. Hulbert did talk to me, that he would get me life imprisonment—life instead of the chair.

Q. Mr. Hubbert talked to you and made promises that you would get life instead of the chair?

A. Yes, sir.

Q. What police——

A. That's what it was, police officers and John Harrell.

Q. John W. Harrell, the State's Attorney at that time?

A. Yes, sir.

Q. Did Mr. Harrell tell you that he would help you get a life sentence if you would testify against Clyde Hysler?

A. He said he wouldn't burn me, that he, Mr. Acosta and Mr. Carson would get me out in three years time."

is the only testimony that bears on the complicity of the prosecutor in the alleged coercion of Baker's testimony:

"Q. Baker do you know whether or not Mr. Harrell [the State's Attorney] knew if you was beat up to make you testify?

A. Yes, sir, he knows I couldn't set down, none of the sheriff's force knew it at the time, they knew it later when I made it in front all of the officers.

Q. When you made that statement you couldn't set down?

A. Yes, sir, and I can't set down good, and I wish you and those men could see that now.

Q. No, we want care to see—that's all you want to say.

A. (Baker nodding his head indicating yes.)"

In his final affidavit on April 9, Baker returns to the alleged promise of the State's Attorney that he would not "burn" him. But there is this time no suggestion that the prosecutor induced or knew of any false testimony by Baker.

We have seen that, according to Baker's first statement on April 7, his attribution of Hysler's responsibility was spontaneous and uncoerced. The circumstances of the case reinforce this and cast a proper scepticism upon Baker's subsequent claims of coercion. According to the affidavits of the two lawyers who represented Hysler at his trials, they examined Baker and Tyler "at great length" in the presence of counsel for the two accomplices and "said witnesses were particularly questioned as to who was involved in said case, and said witnesses denied that anyone was involved in said case other than the defendants named in the indictment; that said witnesses further denied that any statements previously made by them to law enforcement officers were made under duress or with any hope or expectation of reward." And the present Chief Justice of Florida, in his separate opinion on Baker's appeal, characterized Baker's confession as

"entirely free and voluntary." 137 Fla. 27, 29, 188 So. 634, 635.

In addition to these four affidavits by Baker, there were four subsidiary affidavits by others. Their want of significance is sufficiently attested by the fact that on the motion for rehearing of this cause before the Florida Supreme Court, reliance was placed exclusively upon the Baker affidavits and no reference whatever was made to these subsidiary affidavits. Nor was reliance upon them made here.

The essence of Hysler's claim before the Supreme Court of Florida was that his conviction was secured by unconstitutional means, that Baker was coerced to testify falsely by responsible state officials. The Court had to judge the substantiality of this claim on the basis of all that was before it, namely, the petition with its accompanying affidavits and the records of prior cases arising out of the same crime. The Court concluded that Hysler's proof did not make out a *prima facie* case for asking the trial court to reconsider its judgment of conviction. However ineptly the Florida Supreme Court may have formulated the grounds for denying the application, its action leaves no room for doubt that the Court deemed the petitioner's claim without substantial foundation. We construe its finding that the "petition" did not show the responsibility of the state officials for the alleged falsity of Baker's original testimony to mean that the petitioner had failed to make the showing of substantiality which, according to the local procedure of Florida, was necessary in order to obtain the extraordinary relief furnished by the writ of error *coram nobis*.[4] And our

---

[4] The opinion of the Florida Supreme Court on petitioner's motion for rehearing states, *inter alia*, that: "The allegations of the petition do not show that the prosecuting attorney had any guilty knowledge of the alleged maltreatment of the witness [Baker], or that the

independent examination of the affidavits upon which his claim was based leaves no doubt that the finding of insubstantiality was justified. It certainly precludes a holding that such a finding was not justified.

The State's security in the just administration of its criminal law must largely rest upon the competence of its trial courts. But that does not bar the state Supreme Court from exercising the vigilance of a hardheaded consideration of appeals to it for upsetting a conviction. That in the course of four years witnesses die or disappear, that memories fade, that a sense of responsibility may become attenuated, that repudiations and new incriminations like Baker's on the eve of execution are not unfamiliar as a means of relieving others or as an irrational hope for self—these of course are not valid considerations for relaxing the protection of Constitutional rights. But they are relevant in exercising a hardy judgment in order to determine whether such a belated disclosure springs from the impulse for truth-telling or is the product of self-delusion or artifice prompted by the instinct of self-preservation.

Our ultimate inquiry is whether the State of Florida has denied to the petitioner the protection of the Due Process Clause. The record does not permit the conclusion that Florida has deprived him of his Constitutional rights.

Petitioner also claims that Florida has denied him the "equal protection" of its law. This contention is plainly without substance. If Hysler had been singled out for invidious treatment by the Florida Supreme Court, he could properly complain here. Compare *Yick Wo* v.

---

alleged falsity of the testimony of the witness Baker was known to the prosecuting officer. The petition does not show that any alleged maltreatment of witness was inflicted by any officer of the trial court or that same was known to any officer of the trial court." 146 Fla. 593, 594, 1 So. 2d 628.

*Hopkins,* 118 U. S. 356; *McFarland* v. *American Sugar Co.,* 241 U. S. 79. But it is not a fact that the Florida Supreme Court has granted such applications in other cases but not in Hysler's. See, e. g., *Skipper* v. *Florida,* 127 Fla. 553, 173 So. 692; *McCall* v. *Florida,* 136 Fla. 349, 186 So. 803.

*Affirmed.*

MR. JUSTICE BLACK, dissenting, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY concur.

The application denied by the Supreme Court of Florida alleges that Tyler and Baker, the accomplices in the murder for which Hysler was convicted, confessed and gave false testimony against Hysler because they were "coerced, intimidated, beaten, threatened with violence and otherwise abused and mistreated," and because they were promised life sentences instead of the electric chair. Sworn statements of Baker made in a state prison in the presence of prison officials were presented in support of these allegations, as were corroborative affidavits of four others. Tyler, a fugitive from justice, is unavailable to the petitioner as an additional source of verification.

The Florida Supreme Court has stated that the petition does not assert that "the alleged falsity of the testimony of the witness Baker was known to the prosecuting officer." In *Mooney* v. *Holohan,* 294 U. S. 103, this Court held that the use by a State of testimony known by its "prosecuting authorities" to be false is a denial of due process of law. I do not, however, regard this as a proper occasion to determine whether the rule of *Mooney* v. *Holohan* applies only where the guilty knowledge is that of "the prosecuting officer" and not any other responsible official. For even if every representative of the State believed that the confessions of Tyler and Baker were true in every detail, other allegations of the petitioner make out a denial of due

process on independent grounds, upon which the scope of *Mooney* v. *Holohan* has no bearing. In those cases in which this Court held that a conviction based on confessions wrung from the accused or his accomplices by third-degree methods was offensive to the guarantees of the due process clause, there are no indications that the knowledge of any of the state officials involved as to the truth or falsity of the confessions was deemed relevant.[1] And if the allegations of Hysler's petition are true, that is, if Tyler and Baker were held incommunicado and tortured into supplying the controlling testimony at Hysler's trial, his conviction is tainted with a measure of brutality which I had supposed was sufficient, without more, to establish a violation of Constitutional rights. I am therefore unable to agree with the statement of the Florida Supreme Court that "if all petitioner alleges in his petition had been true and had been fully made known to the trial court and to the jury which tried the defendant-petitioner, it would not have precluded the entry of the judgment upon a verdict of guilty of Murder . . ." Nor do I go along with the intimations of approval of that statement to be found in the opinion which this Court has just handed down.

The opinion of this Court does not rest solely on the ground that Hysler's allegations, if true, fail to establish a denial of due process. The Court finds in the opinion of the Florida Supreme Court a determination that "Hysler's proof" was insufficient "to make the showing of substantiality which, according to the local procedure of Florida, was necessary in order to obtain the extraordinary relief furnished by the writ of error *coram nobis.*" But "Hysler's proof" is nowhere mentioned in the opinion below, and of the eight reasons there given for denying Hysler's petition, the only one which touches in any

---

[1] *E. g., Brown* v. *Mississippi*, 297 U. S. 278; *Chambers* v. *Florida*, 309 U. S. 227.

way upon the credibility of his allegations accepts them as true.

To be convinced that the Florida Supreme Court did not pass on the credibility of Hysler's allegations but merely decided that these allegations, however fully proved, would not make out a violation of due process, I should need to look no further than the opinion below. But more support for this interpretation of Florida's denial of Hysler's petition is amply available in other decisions of its highest court. In *Washington* v. *State,* 92 Fla. 740, 749, 110 So. 259, 262, for example, the Florida Supreme Court said the issue to be determined when such a petition is before it is "whether . . . the *facts alleged"*—not the *proof*—"would afford, at least *prima facie,* just ground for an application to the lower court for a writ of error *coram nobis."* That is not to say that the Florida Supreme Court will not deny a petition when the facts alleged are so patently incredible that further pursuit of the remedy would be a frivolous imposition upon the trial court. Thus, in *McCall* v. *State,* 136 Fla. 349, 350, where the allegations of the petitioner denied his guilt for the first time, were without any supporting affidavits, and were "positively and directly contradicted" by himself and other witnesses at the trial, the court denied the petition, stating that to grant it "would be no less than a trifling with justice." Even under such circumstances, however, the court explicitly pointed out that it had looked into "the probability of the truth" of the allegations. And where there is a color of plausibility in the allegations, the court has been meticulous to give the petitioner ample opportunity to prove them. In *Chambers* v. *State,* for example, Mr. Justice Buford, who spoke for the court in its opinion on Hysler's petition said: "The petition for leave to file writ of error *coram nobis* presents allegations which, if true, would constitute ground for issuing the writ. It is not

the province of this Court to determine whether or not such allegations are true. The determination of such question may be had in the circuit court under issues duly made for that purpose." 111 Fla. 707, 713, 152 So. 437.

It must also be borne in mind that if the proof accompanying a petition for leave to apply for a writ of error *coram nobis* had to be so full as to establish conclusively the truth of the allegations, petitioners who required the amplifying or corroborative evidence of inaccessible or unwilling witnesses would be effectively barred from access to this remedy, for they would never have the opportunity to utilize the compulsory process which a trial of the facts would afford. In the light of Florida's liberal treatment of other petitioners in other cases,[2] and the unambiguous explanation its courts have given where petitions have been denied, I cannot impute to the Florida Supreme Court, on the basis of its opinion in this case, a decision that Hysler's "proof" was inadequate to support his allegations.

Although it is at best not clear that the court below has canvassed the issue of credibility, this Court has not hesitated to do so. In the opinion just announced, there has even been a recital of considerations relevant in determining whether the disclosure made by Baker "springs from the impulse for truth-telling or is the product of self-delusion or artifice prompted by the instinct of self-preservation." And the Court has apparently concluded that Hysler's allegations are so patently incredible that due process does not require a hearing. Where, as here, allegations that controlling testimony was extorted by

---

[2] See *Nickels* v. *State*, 86 Fla. 208, 98 So. 497, 502, 99 So. 121; *Lamb* v. *State*, 91 Fla. 396, 107 So. 535; *Washington* v. *State*, 92 Fla. 740, 110 So. 259; *Chambers* v. *State*, 111 Fla. 707, 151 So. 499; 113 Fla. 786, 152 So. 437; 117 Fla. 642, 158 So. 153.

third-degree methods are supported by sworn statements and not denied by anyone, a summary rejection of them without hearing by the court of first instance would raise serious questions of compliance with the Constitutional requirement of a fair trial.[3] Under such circumstances, I should suppose this Court would be particularly reluctant to make the original and only disposition itself of what it treats as a major issue of the case: the credibility of Hysler's allegations.

The Supreme Court of Florida declined even to consider the credibility of these allegations, proceeding on the assumption—erroneous if tested by principles which I believe decisions of this Court have affirmed [4]—that, if true, they would be insufficient to impugn the conviction. Having corrected this erroneous assumption, this Court, in my opinion, should allow the Florida courts to make their own disposition of the issue they have not considered. We granted certiorari because of a "solicitude, especially where life is at stake, for those liberties which are guaranteed by the Due Process Clause of the Fourteenth Amendment." That solicitude would seem to call for remanding this case for further consideration below. I cannot see why it should impel this Court to sustain the conviction upon a gratuitous disposition of an issue which the state court might resolve otherwise.

In cases raising no issue of life or death this Court has not hesitated to remand to the lower court for further proceedings where ambiguities in the opinion below beclouded the ground of decision.[5] The vital issues here

[3] Cf. *Mooney* v. *Holohan, supra; Smith* v. *O'Grady,* 312 U. S. 329.

[4] See cases cited in footnote 1, *supra,* and *Canty* v. *Alabama,* 309 U. S. 629; *White* v. *Texas,* 310 U. S. 530; *Lomax* v. *Texas,* 313 U. S. 544; *Vernon* v. *Alabama,* 313 U. S. 547.

[5] *Villa* v. *Van Schaick,* 299 U. S. 152; *State Tax Comm'n* v. *Van Cott,* 306 U. S. 511; *Minnesota* v. *National Tea Co.,* 309 U. S. 551.

and the manner of treatment below compel me to believe that a like procedure should be followed now. Because the basis for my belief can best be shown by reference to the record, I am adding excerpts from the petition and accompanying exhibits as well as the whole of the opinion of the Florida Supreme Court in an appendix.

APPENDIX.

I. Excerpts from Hysler's petition for leave to apply for a writ of error *coram nobis*:

". . . Alvin Tyler and James Baker who were co-defendants of the petitioner, Clyde Hysler, and upon whose testimony the State of Florida relied upon for a conviction of petitioner was coerced, intimidated, beaten, threatened with violence and otherwise abused and mistreated in order to compell the said witnesses, Tyler and Baker to give testimony at the trial of said cause against petitioner and to implicate said petitioner in the killing of Mrs. Mamie Surrency; and further that the said witnesses, Tyler and Baker were promised immunity from the electric chair, by John W. Harrell and further promised if they would implicate Clyde Hysler in said murder and testify against him during the trial of said cause that he as State's Attorney of the Fourth Judicial Circuit of Florida together with other law enforcing officers of Duval County, Florida would see that he did not get the chair, and that they would procure a pardon and have him released from the State Penitentiary after serving three (3) years of his sentence, all of which is more particularly described by reference to a statement and affidavit made by the said James Baker on the 7th day of April, A. D. 1941, also by further affidavit and statement made by the said James Baker on the 8th day of April, A. D. 1941, and also by statement and affidavit made by the said James Baker on the 9th day of April, A. D. 1941, said affidavit being marked 'A–b and c' respectively and hereby made a part of this petition as fully as though set out herein in haec verba. And for further reason that said affidavits show that the said petitioner was not implicated in the murder of the said Mrs.

Mamie Surrency but that one Joe Peterson, Sr. was the person implicated in said murder and not the petitioner, Clyde Hysler, all of which is set out herein more fully in the affidavits herein above referred to and further substantiated by photostatic copies of the following affidavits, to-wit; affidavit of one Ed. Mosley; affidavit of one A. J. Mooney; affidavit of one Mrs. Ruby Crews and affidavit of one Rudolph J. Dowling, said photostatic copies being marked 'd-e-f and g' respectively, and each of said affidavits being hereto attached and hereby made a part of this petition as fully as though set out herein in haec verba.

 . . . . .

"That the said witnesses, Alvin Tyler and James Baker immediately after and following their arrest were held incommun-cado for a long period of time without being allowed the benefit and advice of counsel, without being allowed to see or confer with their friends or relatives and without being allowed to confer with the attorneys for the petitioner; that said witnesses, Tyler and Baker were removed from the Duval County Jail and confined in the State Penitentiary at Raiford, Florida with instructions to allow no one to communicate with them for a long period of time immediately following their arrest, and it became necessary for the attorneys for petitioner to procure an order of the Circuit Court of Duval County for permission to confer with said witnesses several weeks after their arrest, and then only in company with, and in the presence of the attorneys appointed by the Court to represent said witnesses and said attorneys for petitioners made diligent effort to ascertain from said witnesses facts about which they would testify to in trial of said petitioner, and thereby used diligent effort in trying to procure the information as set out herein by the respective affidavits by the witness, James Baker, but said witness Baker was afraid to divulge the truth to the attorneys for the petitioner as set out herein in the said affidavits, a-b and c hereto attached, and that said petitioner was denied a fair and impartial trial by reason of the coercion and intimidation of the witnesses, Alvin Tyler and James Baker and the hope of reward promised them as hereinabove set forth, and has by reason thereof denied equal

430

protection of the law as guaranteed to him by the 14th Amendment to the United States Constitution and was thereby denied due process of the law as guaranteed by the 5th Amendment of the United States Constitution.

. . . . .

"That had the said witnesses, Tyler and Baker not been intimidated, coerced and promised immunity from the electric chair by the law enforcement officers in Duval County as described in affidavits 'a-b and c' hereto attached, and by John W. Harrell as herein above described, and the said witnesses had been left free to testify and tell the truth as to the said Joe Peterson, Sr. being the person involved in the murder of the said Mrs. Mamie Surrency instead of the petitioner, said testimony would have prevented the rendition of the judgment, verdict and sentence of petitioner in this cause, and if another trial be had of this cause, this petitioner would be acquitted.

. . . . .

"That petitioner further alleges that the affidavits of the witness, James Baker, being affidavits hereto attached and marked 'a-b and c' and made by the said James Baker freely and voluntarily on his part and without any suggestion of prompting on the part of petitioner or any one on his behalf, and that the statements contained in said affidavits were made in the presence of several prison officials at Raiford, Florida after said James Baker made a voluntarily request to see and talk with the attorney for petitioner."

II. Excerpts from exhibits accompanying Hysler's petition: (These are from the transcript of three conferences held in a Florida prison on April 7 and 8, 1941. Baker was under oath. Where the statements are not in narrative form, the questioner is Hysler's attorney.)

". . . James Baker . . . deposes and says:
"That after the killing of Mr. and Mrs. Surrancy near Grand Crossing in Jacksonville, Florida on the 23rd day of November 1936, that he and Alvin Tyler, the man who was with him at the time of the said killing agreed between them while they were in Cracker Swamp in the

Marietta section of Duval County, that they would lay the blame of the planning of the robbery of the Surrancys upon Clyde Hysler because they had had considerable liquor dealings with Clyde Hysler and knew him well, and for the reason that the Hyslers bore a bad reputation in Duval County, and for the further reason that Clyde Hysler's father had plenty of money and they thought that by laying the planning of the robbery of the Surrancys on Clyde Hysler that his father and his other relatives would put up sufficient money to get Clyde Hysler out of the trouble and that by laying it on to Clyde Hysler that he, James Baker and Alvin Tyler would escape the death penalty, that in truth and fact, that Clyde Hysler was not implicated in the planning of the robbery and had nothing to do with the killing of Mr. and Mrs. Surrancy, but that one Joe Peterson, Sr. was the man who planned the robbery and hired the said James Baker and Alvin Tyler to perform the robbery after being advised by the said Joe Peterson that it would be no trouble, and that Mr. Surrancy did not carry a gun, and all they would have to do would be to point the pistol at him and take the money, that affiant further deposes and says:

"That Clyde Hysler was in no way responsible for the attempted robbery of Mr. and Mrs. Surrancy; that he had nothing to do with it, and the man who planned the robbery and was supposed to protect us in the robbery was Joe Peterson and not Clyde Hysler; that Joe Peterson was in the immediate vicinity when the attempted robbery and the killing of the Surrancys took place, and had it not been that Joe Peterson planned the robbery and hired Alvin Tyler and myself to rob Mr. Surrancy they would probably have still been living and we would not be in any trouble."

. . . . .

"Q. Now Baker, I don't want you to tell me anything except the truth, I want you to tell me if Joe Peterson was the man that got you into all of this instead of Clyde Hysler.

A. Yes, sir, he is the man.

Q. Then you and Alvin Tyler planned to lay this all on Clyde Hysler in order to try to get out of it yourself or to get a life sentence instead of the chair?

A. Yes, sir.

. . . . .

"Q. You recall what officers brought you over here?

A. Mr. Gene Griffen and Mr. Dick Barker and some more officers.

Q. Now what threats or promises did they make you to testify and implicate Clyde Hysler?

A. Well, Mr. Griffen and them didn't, they didn't make no promises, Mr. Hulbert did talk to me, that he would get me life imprisonment—life instead of the chair.

Q. Mr. Hubbert talked to you and made promises that you would get life instead of the chair?

A. Yes, sir.

Q. What police——

A. That's what it was, police officers and John Harrell.

Q. John W. Harrell, the State's Attorney at that time?

A. Yes, sir.

Q. Did Mr. Harrell tell you that he would help you get a life sentence if you would testify against Clyde Hysler?

A. He said he wouldn't burn me, that he, Mr. Acosta and Mr. Carson would get me out in three years time.

Q. Was Detective Cannon and—you was talking about and Inspector Acosta——

A. The two men that arrested me, yes sir.

Q. Now from the time you was arrested, Baker, how long was you kept to yourself before you was allowed to talk to your lawyer or your friends?

A. From the time I was arrested until the 21st of January, till we went back and had my trial set.

Q. The day you were arraigned in Circuit Court for the trial?

A. Yes, sir.

Q. You was held to your self without being allowed to communicate with any of your friends or your lawyer?

A. Yes, sir.

Q. When was you arrested?

A. It was on the 23rd—24—26—when was Thanksgiving Day—just a few days.

Q. You was arrested just a few days after Thanksgiving?

A. Yes, sir.

. . . . .

"Q. Did any of those officers threaten you?

A. They carried me in a dark room——

Q. That was here?

A. No, sir, that was in Jacksonville, they carried me out to Marietta and whipped me.

Q. What was that with?

A. Something covered up in canvas, I don't know what it was and a piece of hose and something looked like a pine limb.

Q. You remember any of those names?

A. Yes, sir.

Q. Who were they?

A. Mr. Woods, R. L. Woods, and Mr. Carson slapped me two or three times and gave them the black jack to beat me with. . . .

Q. That was in the presence of Mr. Woods, Carson and Acosta?

A. Yes, sir.

Q. That was to try to make you implicate Mr. Hysler in the robbery of Mr. Surrency and Mrs. Surrency?

A. Yes, sir.

Q. And if it hadn't been for the beatings and threats and the promises to get you out of here in three years as you have stated above would you have implicated Mr. Hysler in the case at all?

A. No, sir, cause I told them I didn't no anything about it; and another thing, between Mr. Hysler's first trial and last one, Mr. Harrell came down to the County Jail after I was allowed to see people, I said, don't you know that if you burn Mr. Hysler you will have to burn me too, and he said he could burn the whole Hysler family and don't burn me cause he and Mr. Sidney Hulbert, Mr. Carson and Mr. Cannon and some more officers was going to run the County as long as they were running it.

. . . . .

"Q. Baker, how many times did the officers threaten you and beat you after you were arrested?

A. They beat me about three o'clock in the morning to ten o'clock before they got me to say anything.

434

Q. It was the police made you tell the sheriff's office?
A. Yes, sir.
Q. Was you afraid not to tell them what they wanted you to, afraid they would beat you some more?
A. Yes, sir, if them—I said two words they would slap me, before the sheriff bunch got there they had sent out and bought me dinner, give me $5.00 or $6.00 dollars in money, and said don't tell any body about me being whipped, if anyone asked me, tell them no.
Q. Then it was a definite promise from Mr. Harrell, the State's Attorney to keep you from burning?
A. He said that he would see that I would get life, but that he would see that I didn't stay at the chain gang but three years.

. . . . .

"Q. Baker what about the remarks you wanted to make?
A. Where they kicked me.
Q. That at Jacksonville police station?
A. Yes, sir.
Q. Who was that?
A. Mr. Carson, thats who had me at that time, he taken me down there where a bunch of police was shooting pool.
Q. What all did they do to you?
A. Those officers down there asked him if he made me tell him what they wanted to know, and Mr. Carson—Mr. Carson said not yet, and they said, turn him loose with us about 25 minutes and we will make him say anything they wanted me to say, and he told them to take me and hold me until they went up into the office and make a call, and while he was gone to make a call they carried me back into a room and put a coat over my head and went to beating me, I got scars on me now, I want to show them to you and its what you call risons, you can get your doctor and he will tell you what was caused from blows——
Q. You still have scars on you from that beating?
A. Yes——
Q. Was those beatings that caused those scars on you to tell on Clyde Hysler?
A. To make me tell anything.
Q. Did they mention Clyde Hysler's name to you while they were beating you?

A. Yes, sir.

Q. Do you know the names of those officers?

A. No, sir, those were new officers to me, they were speed cops, had those things on their shoulders.

Q. Did any of them tell you that Clyde Hysler was mixed up in the killing or such as that?

A. They said they knew he was in it—and after I told how it was they made me implicate him.

Q. Implicate him?

A. Yes, sir.

Q. As a matter of fact, Hysler was not mixed in it but it was Joe Peterson——

A. They had me hand cuffed behind my back and I was chained and beat me, . . .

. . . . .

"Q. Baker do you know whether or not Mr. Harrell knew if you was beat up to make you testify?

A. Yes, sir, he knows I couldn't set down, none of the sheriff's force knew it at the time, they knew it later when I made it in front all of the officers.

Q. When you made that statement you couldn't set down.

A. Yes, sir, and I can't set down good, and I wish you and those men could see that now."

III. The opinion of the Supreme Court of Florida on motion for rehearing: (No opinion accompanied the original denial of Hysler's petition.)

"Buford, J.:

On motion for hearing on application for an order for leave to apply to the Circuit Court of Duval County for a writ of error coram nobis to review the judgment of conviction of petitioner of the offense of Murder in the First Degree heretofore entered in that Court, on grounds stated in the petition, we have denied the petition for reasons as follows:

(a) This Court may take judicial cognizance of its own records and the record lodged in this Court on the writ of error to the judgment of conviction of the petitioner shows ample evidence to support the judgment of conviction without the aid of the testimony given on that trial by the witness James Baker.

(b) Writ of error, coram nobis will not lie because of false testimony given at the trial by important witness. Lamb *v.* State, 91 Fla. 396, 107 Sou. 535.

(c) Matters properly presentable for writ of coram nobis are such as would have prevented conviction and not such as may have caused a different result. Chesser *v.* State, 92 Fla. 754, 109 Sou. 906.

(d) If witness Baker swore falsely at defendant's trial, that fact was known to petitioner at the time of the trial. Washington *v.* State, 95 Fla. 289, 116 Sou. 470; Pike *vs.* State, 103 Fla. 594, 139 Sou. 196.

(e) The allegations of the petition do not show that the prosecuting attorney had any guilty knowledge of the alleged maltreatment of the witness, or that the alleged falsity of the testimony of the witness Baker was known to the prosecuting officer.

(f) The petition does not show that any alleged maltreatment of witness was inflicted by any officer of the trial court or that same was known to any officer of the trial court.

(g) The records of this Court, of which we take judicial cognizance, show that petitioner was convicted on trial held subsequent to the trial and confiction of the witness Baker of the offense of Murder in the first degree without recommendation to mercy, and that both trials were conducted on behalf of each defendant by able, diligent and faithful counsel.

(h) If all petitioner alleges in his petition had been true and had been fully made known to the trial court and to the jury which tried the defendant-petitioner, it would not have precluded the entry of the judgment upon a verdict of guilty of Murder in the first degree having been returned by the jury.

So it is, the petition is insufficient to require us to grant same and for such reasons the same was denied and the petition for rehearing is likewise denied.

So ordered.

Terrell, J. Thomas and Chapman, J. J. Concur.

Brown, C. J. Dissents."