**William ANDERSON, Petitioner-Appellant,**

v.

**UNITED STATES of America, Respondent-Appellee.**

**Harold MOFFETT, Petitioner-Appellant,**

v.

**UNITED STATES of America, Respondent-Appellee.**

**Nos. 16618, 16619.**

United States Court of Appeals Seventh Circuit.

Nov. 13, 1968.

Rehearing Denied Dec. 10, 1968.

Certiorari Denied March 10, 1969.

See 89 S.Ct. 1009.

Melvin B. Lewis, Chicago, Ill., for William Anderson.

Frank Oliver, Chicago, Ill., for Harold Moffett.

Thomas A. Foran, U. S. Atty., Jack B. Schmetterer, Asst. U. S. Atty., Chicago, Ill., for respondent-appellee; John Peter Lulinski, Michael B. Nash, Richard S. Jalovec, Asst. U. S. Attys., of counsel.

Before KILEY, SWYGERT and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

This is an appeal from an order denying the petitioners' motions under 28 U.S.C. § 2255 to vacate the convictions and sentences under which they are serving. Petitioners' motions alleged unlawful imprisonment arising from the use of perjury at their separate trials. Both petitioners further alleged that their convictions were the product of the knowing use of perjury by Government agents and an assistant United States Attorney.

The petitioners contended and the Government agreed that the relevant facts are contained in the official transcripts of evidence submitted at the two trials, and accordingly there was no need for an evidentiary hearing. No hearing was requested by the petitioners in their original motions and consequently none was held.

The district court considered the petitions jointly and dismissed them without hearing. The court ruled that the records showed that the petitioners were entitled to no relief and that careful examination did "not reveal * * * any of the inconsistencies which each of the petitioners would read into the testimony and which each alleges to exist."

Petitioner Harold Moffett was charged in a four-count indictment with the unlawful receipt, concealment, and sale of narcotics on October 13, 1964 and December 18, 1964. At a nonjury trial before District Judge Michael L. Igoe, Moffett was found guilty on all four counts and given concurrent ten-year sentences on each count.

Petitioner William Anderson was charged in a four-count indictment with the unlawful sale, concealment, and transportation of narcotics on December

17, 1964 and January 11, 1965. At a jury trial, held three weeks after the Moffett proceedings, before District Judge Joseph Sam Perry, Anderson was convicted on the counts relating to the January transaction, but acquitted on the counts relating to the December charge. Concurrent sentences of fifteen years for the convictions arising from the two January counts were imposed on Anderson.

Both defendants appealed their convictions and both convictions were affirmed by this court. United States v. Moffett, No. 15509 (7th Cir. 1966); United States v. Anderson, 362 F.2d 81 (7th Cir. 1966).

The evidentiary transcripts of the individual trials reveal the following sequence of events during the night in question, December 17–18, 1964. About 5 p. m., on December 17, Federal narcotics agents Tucker, Hill, and Pringle met an informant, Pendleton, at 45th and the Dan Ryan Expressway in Chicago. They drove together to the Grand Prix Tavern at 35th and Indiana. Between 5:30 and 6 p. m. agents Pringle and Hill maintained a watch from their car outside while agent Tucker and the informant went into the Grand Prix where they met defendant Moffett. After talking with Moffett, Tucker and Pendleton stayed at the Grand Prix about ten minutes and then walked one-quarter block down the street to the Subway Lounge where Moffett rejoined them about 6:10 p. m.

A conversation with Moffett, during which agent Tucker gave him money for heroin, took place at the Subway Lounge between 6:10 and 6:20 p. m. Moffett promised Tucker and Pendleton that he would return to the Subway Lounge about 8 p. m. to conclude the narcotics deal. Tucker testified that from inside the Subway Lounge he watched Moffett leave the Lounge at 6:20 p. m. Agents Hill and Pringle also watched Moffett leave the Lounge and followed him by car to a point about three and one-half miles from the Subway where they lost his car in heavy traffic.

While Hill and Pringle pursued Moffett, agent Tucker and the informant were meeting with Anderson at the Grand Prix. Agent Tucker testified that sometime during the twenty or thirty minutes before 6:30 p. m. he discussed the purchase of narcotics with Anderson and that at 6:30 p. m. Anderson left the Grand Prix. About 7:45 p. m. a phone call from Anderson to the informant was monitored by Tucker at the Grand Prix. Tucker and the informant left the Grand Prix and drove a short distance to a parking lot where Tucker saw Anderson stoop down, pick up a small package from the ground and deliver it to the informant. At 7:55 p. m. the informant consummated the purchase from Anderson. The informant and Tucker proceeded about ten blocks to a point where a test was made which established the package's contents as narcotics.

Testimony in the Moffett trial next places the informant and agent Tucker back at the Subway Lounge between 8 and 8:30 p. m. where they waited until 2:30 a. m. on December 18th when they made a narcotics purchase from Moffett.

Although Anderson was acquitted on the charges covering the December 17th transaction, in this proceeding he claims that his sentence and conviction are the product of Government perjury in regard to that transaction. Likewise, Moffett complains that because the testimony relating to the events of December 17th and 18th was perjured, he was convicted on two counts of the indictment relating to the sale and possession of narcotics on December 18, 1964. However, Moffett was also convicted on two counts covering possession and sale of narcotics for a wholly unrelated transaction which occurred on October 13, 1964. Therefore, it is hard to imagine what petitioners could possibly gain if successful in this appeal since they still would stand convicted of the offenses which were unrelated to the December 17–18 events.

Nonetheless, petitioners attempt to avoid this observation by claiming that if

the trier of facts in each case had been aware of the alleged perjury of the agents covering the December 17th and 18th events, then the respective triers of fact would have been highly unlikely to find the petitioners guilty as to the occurrences on the other dates. In other words, the petitioners contend that the alleged perjury so pervaded the entire proceedings that all the convictions are tainted. Since, as we will indicate below, these perjury allegations are unsupported by the record, we need not consider this argument advanced by the petitioners.

■ The law applicable to the knowing use of perjury at trial is settled. A criminal conviction procured by the use of testimony known by the prosecuting authorities to be perjured and knowingly used by them in order to procure a conviction does not comport with due process of law and is violative of a defendant's constitutional rights. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); Hysler v. State of Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942); United States v. Spadafora, 200 F.2d 140 (7th Cir. 1952). The knowing use by the Government of perjured testimony in order to obtain a conviction would, if proved, be grounds under section 2255 for vacation of a conviction under circumstances such as exist here where the petitioners assert that they were unaware of the alleged perjury both at the time of the trial and the appeals. A defendant has the burden of making a showing, not only that material perjured testimony was used to convict him, but that it was knowingly and intentionally used by the prosecuting authorities to do so. United States v. Spadafora, 200 F.2d at 142.

■ Mere inconsistencies or conflicts between the testimony of a witness or witnesses are not enough. "[T]rivial conflicts in testimony * * * do not constitute perjury. * * * Those experienced in the trial of cases realize that it is a common occurrence to have some conflicts in the testimony of wit-

nesses, and that any conflict in itself is not a signpost of perjury." United States v. Spadafora, 200 F.2d at 142. More than "immaterial inconsistencies" are required for perjury. Enzor v. United States, 296 F.2d 62, 63 (5th Cir. 1961).

■ The standard of perjury, that is, some palpable testimonial contradiction or untruth, is applicable not only to a case like Spadafora where the alleged perjury occurred within the context of a single trial, but also to the cases at bar where the alleged perjury occurred, if at all, in the course of the testimony of the same witnesses at different trials.

■■ Although we recognize that the rationale for the palpable contradiction rule, namely, that "[a]ny conflicting statement of witnesses upon the trial * * * [are] for the jury to resolve," United States v. Spadafora, 200 F.2d at 142, is inapplicable where the perjury arises from testimony given at separate trials before different triers of fact, we still believe that, regardless of the alleged perjury's context, immaterial testimonial inconsistencies by themselves do not constitute perjury.

■ Moreover, to be grounds for relief under section 2255, the testimonial inconsistencies must have a direct relationship to the transactions which formed the basis of the conviction. In United States v. Abbinanti, 338 F.2d 331, 332 (2nd Cir. 1964), in affirming the denial of a section 2255 motion, the court, answering the petitioner's claim that his conviction rested on perjured testimony, said, "Even if Moreton [witness] was mistaken as to these matters [certain time testimony], they have no direct bearing on whether Abbinanti purchased, possessed and sold narcotics himself * * *."

Turning to the allegations of perjury in the cases at bar, it is apparent that agent Tucker's whereabouts from the time of Moffett's departure from the Subway Lounge at 6:20 p. m. to about 8 p. m. when Tucker testified that he and

the informant were at the Subway waiting for Moffett's return provides the ambiguity which underlies most of the perjury charges. Petitioners claim that since agent Tucker remained at the Subway between 6:20 and 8 p. m., the narcotics sale by Anderson could not have taken place. Apart from some additional inconsequential testimonial discrepancies, it is the precise sequence of agent Tucker's activities during this period of time which is the focus of this appeal.

Petitioners state that agent Tucker, in the Moffett trial "[s]wore that on the night in question he spent the hours between 6 and 9 p. m. in the Subway Lounge Tavern never leaving." We find this conclusion is unwarranted in light of Tucker's testimony hereinafter quoted. In fact, at the Moffett trial, Tucker was never even questioned specifically about the events that happened between 6:20 p. m. when Moffett left Tucker at the Subway Lounge and 8 p. m. when Moffett promised to return.

The Moffett transcript indicates that Tucker testified only broadly as to the general sequence of events between 6:20 p. m. and 2:30 a. m. On direct examination Tucker testified:

Q. Was there any further conversation in the Subway with you and the defendant Harold Moffett, at this time [6:10 p. m.]?

A. Yes. Again, Moffet told me that he wanted the money out front. * * * I agreed to his demands and at Moffett's request I placed $105 official advanced funds on the bar. Moffett took the $105 official advanced funds, counted the money, and told me he would return to the Subway at approximately 8:00 p. m.

Q. Did he leave the Subway Lounge?

A. Yes, he did.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. As he was leaving the Subway Lounge, did you do anything?

A. Yes, I looked out the window of the Lounge to observe the direction in which Moffett was going. I ob-

served him get into his vehicle with several other people and drive north on Indiana out of my view.

Q. Did Mr. Moffett subseqeuently return to the Subway Lounge?

A. He didn't return to the Subway Lounge until 2:30 a. m. the next morning. Early the next morning.

Next, on cross-examination, Tucker was asked where he had been with the informant after Moffett left the Subway Lounge. He responded:

Well, during the period of time between 8:00 p. m. and 2:30 a. m. the next morning I was in and out, both of us were in and out of the Subway Lounge.

Under further cross-examination, Tucker was asked whether he knew anyone in the Subway at the time he first spoke with Moffett. Then he was asked:

Q. Then you left the Subway Lounge, did you?

A. At what time?

Q. Well, excuse me. Strike that, please. I will ask you a different question.

(Question withdrawn.)

Q. Did you leave the Subway Lounge before Mr. Pendleton [informant] left?

A. No, Pendleton and I stayed at the Subway Lounge. Moffett said that he would return about 8:00 p. m. We stayed at the Subway Lounge until around 9:00 o'clock. We then went outside and sat in the car a little while and then came back into the Subway Lounge.

It is the contention of the petitioners that agent Tucker could not have truthfully testified that Moffett "didn't return to the Subway until 2:30 a. m. the next morning" unless he had been there the entire time. We think that the petitioners are attempting to read more into the record than the situation warrants. Viewing the Moffett testimony as a whole, it appears that neither the prosecution nor the defense was much con-

cerned with what transpired between 6:20 and 8 p. m., since neither counsel inquired about Tucker's activities during that period. This lapse in questioning is understandable since to obtain a conviction for the Moffett sale it was of no moment where Tucker was during this period. The crucial facts upon which Moffett's conviction hinged were the exchange of money and the promise to deliver heroin which occurred at 6:20 p. m. and the actual delivery of the narcotics at 2:30 a. m. Given the fact that the same prosecutor tried both cases for the Government, it is obvious that he was aware of all the activities of the agents and perhaps thought it would only confuse or prejudice the presentation of each case to interject details relating to the other defendant.

Because there was no reason for Tucker and the informant to remain at the Subway Lounge between 6:20 and 8 p. m. and because the record does not compel a contrary conclusion, we are unable to say as a matter of fact that Tucker ever testified that he spent the period from 6:20 to 8 p. m. at the Subway Lounge.

The other testimonial contradiction alleged by the petitioners relates to the testimony of agents Hill and Pringle. Against Moffett, the agents testified that at 6:20 p. m. they watched Moffett leave the Subway Lounge and without prearrangement (according to the petitioners) followed him to a point three and one-half miles from the Subway, where they lost his car in heavy traffic. Against Anderson, the same agents testified that at 6:30 p. m., ten minutes after starting to follow Moffett, they trailed Anderson from the Grand Prix to a point about half a mile away.

Two contentions are made concerning the veracity of this testimony. First, petitioners claim that it was impossible for the agents to make the seven-mile trip after Moffett in the space of ten minutes. Surely such an undertaking was physically possible because almost the entire trip was on an expressway. In addition, since the testimony related to events which occurred more than a year before the trials and was taken from the records of separate trials, it is only reasonable to expect the times at best to be close approximations. We are not unmindful of the admonition of the *Spadafora* case that it is unrealistic to expect pinpoint accuracy when time testimony is compared for consistency. This expectation is true not merely in the context of a single trial, but between two separate trials.

Secondly, petitioners argue that the agents "unaccountably" followed Moffett's car and thereby wish to conclude that the agents had no reason to know the identity of Moffett or his car. This is an unjustifiable argument which is, in fact, contradicted by the record. Agent Hill testified regarding what he saw while parked across from the Grand Prix:

Q. What did you observe, if anything, across the street from the Grand Prix Lounge?

A. Across the street from the Grand Prix Lounge we observed a black 1964 Buick. This was the same car that we had observed on October 12th and 13th.

Q. The same car that you observed the defendant Moffett to be driving on October 12th and 13th?

A. Yes, sir.

It is apparent that agents Hill and Pringle knew the identity of Moffett and his car on December 17th. Their trailing of his movements was no accident.

■ Concluding, as we do that the alleged inconsistencies in the agents' testimony are nonexistent or only trivial, it follows that the perjury charge has not been established. Thus, "the motions and the files and records of the case conclusively show that the prisoner is entitled to no relief." Accordingly, we affirm the district court's order.