**UNITED STATES ex rel. ROONEY v. RAGEN.**

**UNITED STATES ex rel. BERRY v. RAGEN.**

**Nos. 9577, 9578.**

United States Court of Appeals Seventh Circuit.

March 22, 1949.

Albert E. Jenner, Jr., Roger W. Barrett, and John Paul Stevens, all of Chicago, Ill., for appellants.

Ivan A. Elliott, Atty. Gen., and William C. Wines, Asst. Atty. Gen., (George F. Barrett, Atty. Gen. of the State of Illinois, Raymond S. Sarnow and James C. Murray, Asst. Attys. Gen., of counsel), for appellee.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

MAJOR, Chief Judge.

These are separate appeals from identical orders, entered December 24, 1947, in each of which a petition for writ of habeas corpus was denied, dismissed and quashed, and the relators remanded to the custody of the respondent. The issues in the two cases are substantially the same, they were heard together below and the separate appeals have here been consolidated.

Petitioner Rooney filed a petition for habeas corpus in the District Court on May 31, 1944, which was dismissed on motion of respondent on March 8, 1946. Rooney appealed, and on November 20, 1946, this court reversed the order of dismissal. United States ex rel. Rooney v. Ragen, 7 Cir., 158 F.2d 346 (hereinafter referred to as our former opinion). Petitioner Berry filed a petition for habeas corpus in the District Court on January 13, 1945,

The motion of respondent to dismiss was denied on March 6, 1946.

Petitioners Rooney and Berry, with Rosalie Rizzo, were tried and convicted of murder in the Criminal Court of Cook County, Illinois, on August 5, 1933. Petitioners were sentenced to the penitentiary for life, and the judgment of conviction was affirmed by the Supreme Court of Illinois, People v. Rooney et al., 355 Ill. 613, 190 N.E. 85. Two other persons, namely, John Jilson and Herbert Arnold, were also named as defendants but, not having been apprehended, were not tried with petitioners and Rizzo.

The proceedings in the State court which resulted in petitioners' conviction are fully set forth in the Illinois Supreme Court opinion and to a lesser extent in our former opinion, which obviates any occasion for their detailed narration at this time. Briefly, a labor dispute was in progress between Goldblatt's Department Store in Chicago and the Circular Distributors' Union, of which petitioner Rooney was president. The headquarters of the Union were located near Goldblatt's. The store had been picketed by the Union, and upon payment of money to Rooney the pickets had been removed. Upon refusal to meet Rooney's further demands, the pickets were reinstated. A course of vandalism was then inaugurated, during which windows were broken, stench bombs thrown into the store and merchandise damaged. Goldblatt's employed persons to guard the store and watch for window breakers. One of such persons was Stanley Gross, who, at about three o'clock on the morning of May 23, 1933, while seated in an automobile in front of the store, was shot and killed by persons riding in a passing automobile. It was for the shooting of Gross that petitioners were convicted.

In our former opinion, we relate in considerable detail the allegations of the petition for habeas corpus filed by Rooney, which we think unnecessary to repeat. The main issue on that appeal was whether his petition was sufficient to require a response by the respondent and to entitle Rooney to a hearing. We concluded that it was, and reversed the lower court's order of dismissal. The petition, in support of the allegation that Rooney was deprived of due process in violation of the Fourteenth Amendment, relies in the main upon two factors, (1) that certain evidence was introduced at the trial which was obtained as a result of an unlawful search and seizure by Illinois officials and, therefore, in violation of his Federal constitutional rights, and (2) that one Davidson, a witness who testified on behalf of the State and without whose testimony a conviction could not have been procured, committed perjury, and that such perjury was with the knowledge and connivance of the prosecuting officials. While other issues have been injected into the proceeding, we think they are more or less incidental to the all-important question as to whether Rooney was deprived of due process so as to nullify the judgment of conviction, and the nature of the cases is such that what is said as to Rooney is equally applicable to Berry.

It is conceded that Rooney and his co-defendant Rizzo were under surveillance by Chicago officers in Wisconsin for several days and were taken into custody by such officers on June 13, 1933, while sleeping in his cottage in Eagle River, Wisconsin. Rooney was handcuffed, taken from his cottage at the point of a gun, placed in the back seat of an automobile and forced to accompany the arresting officers back to Chicago, all without any warrant or process of extradition. The officers also searched the premises, without a warrant or other process, and as a result found in a drawer a pair of field glasses, which they seized without his consent. The police officers also entered and searched a flat occupied by Rooney and Rizzo in Berwyn, Illinois, without a warrant and without their consent. In a dresser drawer they found and seized a receipt for the purchase price of a pair of field glasses. Police officers also entered a garage on the premises of Rizzo's parents without a warrant or other process and seized an automobile belonging to Rizzo, in which petitioners were alleged to have ridden at the time of the shooting. This automobile was displayed to persons who testified at the trial and was also used by the officers in a re-enactment of the shooting before these witnesses. The police officers also searched

the Union headquarters of which Rooney was head, drilled the Union safe and took papers therefrom, all without a warrant.

Prior to trial, the petitioners moved to suppress this evidence illegally seized, the States Attorney confessed that the motion should be sustained and stated that such evidence would not be offered. Of the suppressed evidence, two items, the pair of field glasses and the receipt showing payment for the same, were admitted over objection. These exhibits were offered for the purpose of corroborating certain details of the testimony given by Davidson. As to these items, Rooney's counsel in his brief filed before the Illinois Supreme Court stated, "The court, by admitting the field glasses and receipt, permitted corroboration by Davidson upon an immaterial matter." The Illinois Supreme Court expressed the opinion that the admission of these exhibits was error and criticized the States Attorney because of their introduction, but held that their admission did not constitute reversible error.

Petitioners cite cases in support of the proposition that if the seizure of the evidence in the instant case had been by Federal officers and used in connection with a trial in a Federal court, it would have constituted a violation of the Fourth and Fifth Amendments to the Constitution of the United States, which prohibit unreasonable search and seizure and compulsory self-incrimination. We need not, however, be concerned about these cases because, assuming that such is the law, they admittedly do not apply where the search was made by State officers and the evidence used in connection with a State court trial, which is the situation before us. Nevertheless, petitioners urgently insist that the evidence thus seized was used in violation of the due process clause of the Fourteenth Amendment. Petitioners, while conceding that the Supreme Court has not so broadly interpreted the due process clause, make an impressive argument that the court is headed strongly in that direction.

Numerous cases are cited and quoted from, such as Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223; Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043; Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595; Bute v. Illinois, 333 U.S. 640, 68 S.Ct. 763; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029, asserted to demonstrate that four of the Supreme Court Justices are committed to the proposition that a violation of any of the amendments known as the Bill of Rights by State officers is a violation of the due process clause of the Fourteenth Amendment. And certain expressions by another of the Justices, so it is argued, indicate that he will be aligned with the present minority so as to give the court a majority favorable to petitioners' contention in the instant matter. We think it would be presumptuous on our part to anticipate or speculate on what the Supreme Court will hold if and when it is presented with the instant question. It may be, as argued, that the Supreme Court is advancing steadily in the direction claimed, but it will be time enough for us to follow that court when such a decision is made. It is neither our purpose nor desire to accelerate or become the torch bearer for this ever expanding interpretation of the due process clause by which solemn judgments of State courts are impugned and new avenues of escape suggested to, if not provided for, those against whom such judgments have been pronounced.

When Rooney's case was previously before this court, we thought the most important and in fact the controlling issue presented by his petition was that his conviction (as well as Berry's) was obtained as the result of the perjured testimony by the witness Davidson, with the knowledge, consent and connivance of the prosecuting attorneys. An affidavit of recantation made by Davidson was attached to Rooney's petition, which we treated and considered as a part of the petition, but we also held that upon a hearing such affidavit would be inadmissible in evidence. We based this holding upon Walker v. Johnston, 312 U.S. 275, 284-285, 61 S.Ct. 574, 85 L.Ed. 830. A further reading of that opinion leaves no room for doubt but that the Supreme Court so held. More than that, the court held that upon a trial the petitioner had the burden of sustaining his allegations by

a preponderance of evidence. At the hearing, this affidavit of recantation (as well as other affidavits made by Davidson) were admitted in evidence over the objection of respondent. In view of what the Supreme Court has held, we think they were improperly admitted, but in any event they cannot be relied upon as proof of the perjury alleged. Davidson was called as a court's witness and both sides were permitted to cross-examine him. In his testimony he repudiated his so-called recantations and reaffirmed the incriminating testimony which he gave at the criminal trial. Petitioners were present at the hearing but neither of them saw fit to take the stand and testify in support of their petitions. It is doubtful if there is any competent evidence in support of the perjury charge and certainly none which would have permitted the trial court to make a finding to that effect. But assuming that Davidson committed perjury, there is no proof whatever that he did so with the knowledge and connivance of the prosecuting attorneys.

■ Without doubt, Davidson is a man of bad repute as to truth and veracity, as well as otherwise. The lower court characterized him as a "habitual liar," and petitioners in their brief describe him as a "drunken, irresponsible, untrustworthy, psychopathic, flophouse bum with a criminal record." We find no reason to disagree with this harsh description of him. However, it cannot be denied that Davidson on the night of the murder was in a position where he could have acquired facts to which he testified. According to all the testimony, he was in the Union headquarters on the night of the murder, in company with Rooney and Berry, and we suppose that no person is a liar of such huge proportions that he is incapable of sometimes telling the truth. His testimony was scrutinized by the jury and, corroborated as it was, must have been believed, and this notwithstanding the fact that a number of witnesses testified that his general reputation for truth and veracity was bad. Davidson, as the lower court pointed out, was "certainly not the type of man that a prosecutor would pick out as a witness if he were to choose the type of man that he might use as a witness, * * * yet I probably know very little more about that man than Judge Harry Miller knew when he rendered judgment against petitioners." And it is axiomatic that whatever we may think of the veracity of Davidson or the weight which we might give to his testimony if we were the triers of the facts are of little consequence. That is not the province of a reviewing court, particularly in a proceeding of the instant nature but was peculiarly within the domain of the jury.

■ Much criticism, some of it bitter, is directed at the attorneys who represented the State in the criminal trial. Superficially, some of it seems justified, but upon a careful consideration of the situation as it existed we are not greatly impressed. The activities which are assailed may be divided into two parts, those occurring prior to the conviction and those subsequent. Included in the former, as heretofore noted, is the manner of Rooney's arrest in Wisconsin and his return to Illinois, as well as the illegal seizures. While the activities in this respect cannot be judicially condoned, we do not think they amounted to a violation of the due process clause of the Federal constitution, and we think there is no merit in the criticism that Davidson was kept under "protective custody" by the States Attorney's office from a few days after the murder until the time of the trial and afterwards, and that during such time he was kept at good hotels and paid considerable sums of money by the States Attorney's office for his own comfort and for the support of his wife. The States Attorney was confronted with a situation of major importance. A citizen engaged in a lawful occupation had been brutally murdered and the States Attorney was well within his rights in using every means necessary to protect Davidson or any other witness who had any knowledge as to the perpetrators of the crime. It is not difficult to visualize what would have happened to Davidson if he had been permitted to return to his haunts on West Madison Street.

■ The treatment accorded to Davidson by the States Attorney's office and the means which were employed to protect him pending the trial certainly neither prove nor tend to prove that Davidson was in-

duced to commit perjury. It was all consistent with the sworn obligation of the States Attorney to use every lawful means at his command to insure that Davidson would be available as a witness at the trial. Moreover, most of this pre-trial treatment accorded Davidson was or could have been developed at the trial. At this point it may be observed that petitioners in the trial which resulted in their conviction, as well as before the Supreme Court of Illinois where their conviction was affirmed, were represented by an able and experienced criminal lawyer. It is also claimed that the States Attorney's office had knowledge of Davidson's past history which they deliberately kept from the jury. This charge rests upon the fact that objections were made by the prosecutors and sustained by the court as to certain cross-examination of Davidson as to previous minor offenses. All of such offenses, however, such as his service in the Illinois State Training School for Boys at St. Charles, his service in the Chicago House of Correction, and similar offenses, were misdemeanors, and we think it requires no citation of authority for the Illinois rule that a witness cannot be impeached by showing that he has previously been convicted of a misdemeanor. In any event, the objection of the States Attorney to this character of cross-examination cannot by any stretch of the imagination indicate that the witness was committing perjury.

■ The treatment accorded Davidson by the States Attorney's office subsequent to the trial is of little consequence, even though it shows that he was kept under "protective custody" for some time, was paid considerable sums of money and was employed by the City of Chicago at the procurement of the office of the States Attorney. It perhaps is true that the magnanimous interest which the States Attorney's office displayed in this witness for so long a time is unexplained. But we have no difficulty in discerning that it was regarded as essential that he be protected until the case was finally disposed of. More than that, it is disclosed that two other defendants, John Jilson and Herbert Arnold, indicted with but not tried with petitioners, were later apprehended and tried and that Davidson was a witness in that trial. There is no basis for the intimation that this after-trial treatment of Davidson by the States Attorney's office shows knowledge that his testimony was perjured, and in any event whether the precaution exercised in this respect was greater than the circumstances required is of no concern to the petitioners. It bears no relation to their charge that they were deprived of a fair trial.

This case is an illustration of the widespread and ever increasing abuse now attendant upon the use of the writ of habeas corpus. Designed as a sacred remedy to protect the liberty of the citizen, it has deteriorated to the point where it now serves chiefly as a means by which those confined in prison are enabled to make any kind of a charge, however heinous it may be, against those responsible for their conviction. The prisoner becomes the accuser and public officials, including the Judge who pronounced sentence, the defendants. Such officials, both living and dead, often with enviable records of honorable public service, become the targets of every character of charge capable of conception by the fertile mind of a person in prison who has no responsibility and nothing to lose. And the regrettable fact is that courts, particularly Federal courts, must in the main share the responsibility for this unsavory situation. It is not difficult to visualize that confidence in the administration of justice and the integrity of courts cannot long endure under the system which is presently being tolerated.

In our previous opinion we acknowledged our indebtedness to court-appointed counsel, and we desire to reaffirm our appreciation. The same counsel which we appointed represented petitioners in the court below and again represent them on these appeals. They have contributed freely of their time and have presented the issues before this court with a degree of skill and learning which we have seldom witnessed.

The record discloses that Judge Barnes gave the petitioners every opportunity to prove the charges by which they sought to obtain their discharge. He concluded that

the proof was not sufficient, and with this conclusion we agree. The orders appealed from are, therefore,

Affirmed.