**UNITED STATES ex rel. Lloyd Eldon MILLER, Jr., Petitioner-Appellee,**

v.

**Frank J. PATE, Warden of the Illinois State Penitentiary, Joliet, Illinois, Respondent-Appellant.**

No. 14570.

United States Court of Appeals
Seventh Circuit.

Feb. 15, 1965.

Rehearing Denied April 9, 1965.

William G. Clark, Atty. Gen., Edward A. Berman, Asst. Atty. Gen., Chicago, Ill., Richard A. Michael, Asst. Atty. Gen., of counsel, for respondent-appellant.

Willard J. Lassers, Seymour Bucholz, George Pontikes, George N. Leighton, Edwin H. Conger, Chicago, Ill., Arthur G. Greenberg, Peoria, Ill., for appellee.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Frank J. Pate, warden of the Illinois State Penitentiary, has by this appeal brought before us another phase of the litigation which grew out of the death sentence imposed in 1956 by the Circuit Court of Hancock County, Illinois,[1] on Lloyd Eldon Miller, Jr., petitioner herein, for the murder of Janice May, an eight-year-old girl, at Canton, Illinois.

On August 20, 1963, the governor of Illinois denied Miller's petition for commutation of the death sentence.

The present appeal is by Warden Pate from the order, judgment and decree of the district court entered on December 24, 1963 which ordered a writ of habeas corpus to issue and further ordered petitioner discharged from custody under mittimus issued by the said circuit court. Said order of the district court also authorized said warden to hold petitioner for a new trial in accordance with Illinois law.

1. The present appeal is concerned principally with petitioner's charge that there is new evidence which would establish that at the original trial, with the knowledge of the prosecuting officials, Betty Baldwin, a state's witness, gave perjured testimony against petitioner.

The record shows that at the 1956 trial (Miller v. Pate, Warden, 7 Cir., 300 F.2d 414, 416, note 2), said witness testified in detail that petitioner admitted that he had committed the crime in question and that he had asked her to leave (Canton, Illinois) with him that night, but that she had refused to do so.

In 1963 upon the hearing in the district court in the above-entitled habeas corpus proceeding, the same Betty Baldwin (then known as Betty Curry) testified that petitioner did not tell her that he had killed Janice May.

The district court in ordering a new trial herein or a release of petitioner, based its action upon findings of fact, including the following:

18. The court finds that if this court had been the finder of fact, that [sic] based upon the circumstantial evidence and the confession of petitioner it would have found the petitioner guilty without considering the testimony of Betty Baldwin, now Betty Curry, and further finds that there was ample evidence for such finding by the jury.

19. The court finds, however, that the jury did hear the testimony of Betty Baldwin and that in appearance she is a convincing witness; that from her testimony in this court she stands as a confessed perjurer either in the original trial or in this proceeding and is, therefore, a completely unreliable witness.

20. The court therefore finds that since the jury heard and considered her testimony without having before it the fact of her unreliability, this court is unable to say how the jury would have decided the case had it either heard the case without her evidence, or, if with it, the evidence of her as a confessed perjurer.

21. The court finds that this new evidence, and this alone, unknown to petitioner or any other person until this proceeding, requires the court to issue the writ of habeas corpus.

The district court specifically found that Betty at all times before the trial told the prosecuting officials that petitioner had admitted to her the murder of Janice May, and that none of said officials ever heard of any other version until Betty testified in this proceeding in the district court that she had lied and committed perjury on the original trial, after the statute of limitations[2] had run against a prosecution of her for perjury.

1. For our opinion in a former appeal in this matter, see 300 F.2d 414 (1962).

2. § 3–5(b), ch. 38, Ill.R.S. (1963).

The district court further found that, if she did commit perjury in the trial,

" * * * neither the State's Attorney nor any other person associated with the case had any knowledge whatsoever that she was so doing, but, on the contrary, they all believed with good reason that she was then speaking truthfully."

The district court specifically found

" * * * that neither the State's Attorney nor any other person knowingly presented any perjured testimony against petitioner or suppressed any testimony favorable to him on said trial or participated in any act that coerced or tended to coerce the confession of petitioner or abused him physically or mentally or otherwise or in any way deprived him of any of his constitutional rights under the 14th Amendment or any other constitutional rights under the federal constitution or the constitution of the State of Illinois."

■ The proceedings at the original trial show that the credibility and veracity of Betty Baldwin were tested at the first trial and that the jury which then heard the case necessarily passed upon her credibility. The jury then believed her. Well they might, because undisputed facts and circumstances in evidence corroborated her testimony. When she testified that petitioner asked her to leave with him, her testimony found corroboration in the fact that when she did not agree to go with him, he went alone and was captured by police officers on the other side of the state of Illinois from the town where the murder had been committed and the conversation took place. Flight has always been recognized as a fact to be considered and from which the jury may draw an inference of guilt. People v. Brothers, 347 Ill. 530, 540, 180 N.E. 442 (1932). To the same effect is Edmonds v. United States, 106 U.S.App. D.C. 373, 273 F.2d 108, 114 (1959) where the court said:

"Evidence of flight is competent as having a tendency to establish guilt. Allen v. United States, 1896, 164 U.S. 492, 499, 17 S.Ct. 154, 41 L.Ed. 528; Green v. United States, 1958, 104 U.S.App.D.C. 23, 25, 259 F.2d 180. * * * "

That Betty's credibility became an important question for the jury is indicated by several assaults upon her veracity made by the defense at the trial. At the hearing on the habeas corpus petition in the district court, in an endeavor to show that Betty's testimony at the trial was false, petitioner introduced a statement in question and answer form made by Betty on November 30, 1955 in the lie detector office at Springfield, Illinois, in the presence of Chief of Police Lindzey of Canton, and the operator of the lie detector machine. In the course of that statement she said that she had met petitioner about five weeks previously and had been out with him about seven times on dates. As a consequence thereof, petitioner's counsel characterizes as a falsehood her testimony at the trial when she said that she had known petitioner for approximately two years.[3] We see no basis for this contention. One may know a person long prior to the time that they meet. "Knowing" in ordinary language means to be "acquainted with". "To meet" a person indicates a joining together in some social or other activity temporarily or otherwise.

Petitioner's testimony before the jury was in direct contradiction to Betty's testimony on several material aspects of the state's case. Inescapably the jury was presented with the issue of credibility of these two witnesses. The jury's verdict indicates that, in considering all the evidence in the case and its bearing upon the issue of credibility of these two witnesses, the jury decided that Betty was telling the truth at the trial.

United States ex rel. Rooney v. Ragen, 7 Cir., 173 F.2d 668 (1949), cert. den. 337 U.S. 961, 69 S.Ct. 1524, 93 L.Ed.

3. 300 F.2d 414, 416, note 2.

1759, involved two appeals from district court orders denying petitions for habeas corpus filed by Rooney and Berry, who had been convicted on state charges of murder. One ground relied upon by petitioners was that one Davidson, a state witness, committed perjury, with knowledge of the prosecutors. At 671, we said:

"* * * But assuming that Davidson committed perjury, there is no proof whatever that he did so with the knowledge and connivance of the prosecuting attorneys.

"Without doubt, Davidson is a man of bad repute as to truth and veracity, as well as otherwise. The lower court characterized him as a 'habitual liar,' and petitioners in their brief describe him as a 'drunken, irresponsible, untrustworthy, psychopathic, flophouse bum with a criminal record.' We find no reason to disagree with this harsh description of him. However, it cannot be denied that Davidson on the night of the murder was in a position where he could have acquired facts to which he testified. According to all the testimony, he was in the Union headquarters on the night of the murder, in company with Rooney and Berry, and we suppose that no person is a liar of such huge proportions that he is incapable of sometimes telling the truth. His testimony was scrutinized by the jury and, corroborated as it was, must have been believed, and this notwithstanding the fact that a number of witnesses testified that his general reputation for truth and veracity was bad. Davidson, as the lower court pointed out, was 'certainly not the type of man that a prosecutor would pick out as a witness if he were to choose the type of man that he might use as a witness, * * * yet I probably know very little more about that man than Judge Harry Miller knew when he rendered judgment against the petitioners.' And it is axiomatic that whatever we may think of the veracity of Davidson or the weight which we might give to his testimony if we were the triers of the facts are of little consequence. That is not the province of a reviewing court, particularly in a proceeding of the instant nature but was peculiarly within the domain of the jury."

We affirmed the denial of the petitions for habeas corpus.

In Hysler v. State of Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932, the court reviewed the action of the state court in a case where the death penalty had been imposed on a conviction for murder. The basis of the application was the petitioner's claim that two witnesses who implicated him testified falsely. The Supreme Court, in stating the guide for decision, at 413, 62 S.Ct. at 690, said:

"* * * In this collateral attack upon the judgment of conviction, the petitioner bases his claim on the recantation of one of the witnesses against him. He cannot, of course, contend that mere recantation of testimony is in itself ground for invoking the Due Process Clause against a conviction. However, if Florida through her responsible officials knowingly used false testimony which was extorted from a witness 'by violence and torture', one convicted may claim the protection of the Due Process Clause against a conviction based upon such testimony."

and, at 422, 62 S.Ct. at 694:

"* * * That in the course of four years witnesses die or disappear, that memories fade, that a sense of responsibility may become attenuated, that repudiations and new incriminations like Baker's on the eve of execution are not unfamiliar as a means of relieving others or as an irrational hope for self—these of course are not valid considerations for relaxing the protection of Constitutional rights. But

they are relevant in exercising a hardy judgment in order to determine whether such a belated disclosure springs from the impulse for truth-telling or is the product of self-delusion or artifice prompted by the instinct of self-preservation.

"Our ultimate inquiry is whether the State of Florida has denied to the petitioner the protection of the Due Process Clause. The record does not permit the conclusion that Florida has deprived him of his Constitutional rights."

In *Cobb v. Hunter*, 10 Cir., 167 F. 2d 888 at 889, cert. den. 335 U.S. 832, 69 S.Ct. 19, 93 L.Ed. 385 (1948) the court said:

"It is also argued that since the jury convicted petitioner on the testimony subsequently repudiated, it is the exclusive province of the jury to determine the verity of the original testimony in the light of the recantation. But that would necessarily mean a new trial for every recantation and *due process does not require it*." (Italics supplied.)

Findings of fact 19–21 indicate that the district court there fell into error and ignored the admonitions of the Hysler and Cobb cases. It acted upon a mere recantation by a witness, whose credibility had already been passed upon by the jury at the trial which resulted in petitioner's conviction.

2. Petitioner seeks to draw some favorable inference from the fact that the prosecution took steps to insulate Betty Baldwin as a witness by housing her in a hotel and paying her expenses during and prior to the trial and by assisting her to obtain work in a nursing home, as well as having her escorted while in the county seat by two women deputies.

It is common knowledge that in capital cases, the prosecution customarily takes steps such as these to prevent its principal witnesses from intimidation or interference. Failure to take such safeguards would in many cases jeopardize the administration of justice.

Thus in United States ex rel. Rooney v. Ragen, supra, 173 F.2d 671, we said:

"The treatment accorded to Davidson by the States Attorney's office and the means which were employed to protect him pending the trial certainly neither prove nor tend to prove that Davidson was induced to commit perjury. It was all consistent with the sworn obligation of the States Attorney to use every lawful means at his command to insure that Davidson would be available as a witness at the trial.[4] Moreover, most of this pre-trial treatment accorded Davidson was or could have been developed at the trial. At this point it may be observed that petitioners in the trial which resulted in their conviction, as well as before the Supreme Court of Illinois where their conviction was affirmed, were represented by an able and experienced criminal lawyer. * * *"

3. Petitioner's contention is that his constitutional rights were violated in that the fact was not produced at the trial that an Illinois state chemist had compared a hair which had been found in the vagina of the murdered girl and a purported sample of petitioner's pubic hair. The district court found that a particle taken from the vagina was probably human hair and was not one belonging to petitioner. However the court found that that evidence was of no consequence and did not prejudice petitioner's case. The trial court record

---

4. Thus, in the case at bar, the prosecuting attorney by petition for contempt called the court's attention before the trial started to the efforts of defense counsel to intimidate Betty Baldwin, a state's witness. We hold that this was

proper. The district court found as a fact, *inter alia*, that petitioner's allegation that the citation of defense counsel was without cause and interfered with petitioner's obtaining a fair trial, was false.

shows this evidence was not introduced before the jury.

This finding is not clearly erroneous; in fact, it is supported by substantial evidence.

■ We have searched the record and find that there is no evidence that the hair found on the victim was that of the perpetrator of the crime, whoever he was. The damaged condition of the girl's body[5] when found and the necessary handling thereof by whatever doctors or others who examined it afforded an opportunity for the accidental depositing of the surface hair from the hands, arms or head of any of the examiners. How the hair got there is purely a matter of conjecture. The chemist did not find it in the dead body, but in a plastic container, bearing a notation "Janice May—11–26–55, Dr. R. J. H." Obviously from the time it was found until the hair was put in a container, the body was subjected to handling by divers doctors and perhaps police officers. Even the chemist said only that it was "probably" of human origin.

In view of these facts and the fact that these hairs were not admitted into evidence at the trial, the finding of the trial court that the report of the chemist was of no consequence is not erroneous. We believe it is correct.

4. At the trial, a state chemist, Litterly, testified that petitioner's blood was type "O" and that the blood found on a piece of concrete near the child's body was type "A", as well as the fact that blood found on a pair of men's shorts in the area where the body was found was of type "A". The mother of the deceased girl testified that, according to school records, her daughter had type "A" blood.[6]

Petitioner's counsel in the present proceeding contends that the prosecution "had knowingly permitted a witness to go beyond the truth". He attempts to support this assertion by citing the following:

1. Litterly's report dated December 7, 1955, a copy of which was seen by the prosecution, stated:

"The sample of blood obtained from Lloyd Eldon Miller Jr. (Described as #16) was subjected to serological examination and found to be of Group O.

"The pair of white jockey short (described as #17) were examined by chemical means and found to be heavily stained with blood. Further serological examination revealed that the blood was of human origin and that it was probably of Group A. * * * *"

2. In September 1956, at the trial, Litterly testified as to the shorts:

"I examined and tested 'People's Exhibit 3' to determine the nature of the staining material upon it. The result of the first test was that this material upon the shorts is blood. I made a second examination which disclosed that the blood is of human origin. I made a further examination which disclosed that the blood is of group 'A'."

■ At the hearing in the district court, Litterly testified as a witness for petitioner, and, as to the use of the word "probably" in his report, the record shows his testimony, as follows:

"This is a matter of terminology in report writing that was being used at the laboratory at that time. It was the preference of Mr. Schaich, who was the superintendent at that time, that reports were to be written in that manner; that it was a probable result.

"Q. You mean speaking as a scientific person you did not want to go out on a limb, as a layman would say, isn't that correct?

---

5. 300 F.2d 414, 418, note 4.

6. No objection was made to the admission of the mother's testimony.

"A. No, sir, this was Mr. Schaich's desires, and I had to follow them, sir, that the terminology would be such as that."

We are satisfied by the record that there was no doubt in the mind of witness Litterly as to the type of blood which he found on the shorts and we, therefore, conclude that the prosecution did not knowingly permit Litterly "to go beyond the truth".

■ 5. Furthermore, we conclude that there is no basis for petitioner's contention that the prosecution knowingly used hearsay testimony to establish the child's blood type by her mother's testimony and thus invaded any constitutional right of petitioner.

■ 6. Petitioner further asserts that a fact not revealed during the trial but discovered by him later was that stains on the shorts were not bloodstains but were dried paint. However, the record shows that chemist Litterly testified in the district court that he tested several small pieces cut from this garment to determine the nature of the staining material which was upon it. He also disclaimed stating that all of the dark spots were bloodstains. He confined the result of his test to a determination that some of the stains were blood.

In addition, James S. Martin, called as an expert witness by petitioner, in the district court, admitted that, if there were bloodstains on the shorts on November 26, 1955, he could not say that they would still be visible at the time he testified in the district court, because there was no indication of the extent to which Litterly's testing involved the elution of the stained material.[7]

In view of all the evidence to which we have referred connecting petitioner with the assault on Janice May, we would not be warranted in affirming the granting of a writ of habeas corpus herein

because the shorts would have been tight in the crotch and uncomfortable for petitioner to wear, as argued in petitioner's brief.

7. At the trial in 1956 petitioner offered, as an alibi, witnesses who saw or talked to him both before and after the time of the crime. It appears that William Malmgren, defense counsel, had been to Mrs. Baxter's [8] home and talked with her about the activities of petitioner on the day of the crime and that he had talked with her at other times on the telephone. Thereafter prosecutor Ramsey informed her and other witnesses who had already talked to the defense, when they asked him for advice, that they had a constitutional right not to talk to anyone and that they should make up their own minds whether they should or not and tell the rest in court.

In its brief herein, the state fixes 4 P.M. as the probable time of the crime. In 1963, at the hearing conducted by the Illinois Parole Board on petitioner's plea for commutation of sentence, two children, Adrian Watters and his sister Rebecca, aged 15 and 16, who were 7 and 8 years old respectively at the time of the crime, testified about events occurring eight years previously, with remarkable exactitude.

There is no showing that these alibi witnesses were unavailable at the time of the trial. Moreover, at the parole board hearing they testified that they had not related the story, told by them at the board hearing, until a month before that hearing.

■ More important is the fact that it is neither the purpose nor the practice of the Illinois Parole Board of resolve a legal issue such as the defense of alibi. Alibi is a justiciable issue only in a court where a state's representative as well as the accused are present and where the customary legal safeguards are applied.

---

7. According to the witness, elusion [*sic*] is the process by which the area is wetted and put in contact with filter paper, and the filter paper, by capillary action, withdraws substance for examination.

8. She was petitioner's landlady.

In this court petitioner argues that the testimony of Mrs. Baxter was crucial. There is no reason apparent in the record why she could not have been produced as a witness for the defense. If petitioner at the trial did not wish to be bound by her testimony, he should have laid a foundation by asking the court to call her as a court's witness. This would have involved his producing her in court by subpoena, calling her as a witness for the defense and having her identify herself and then proceeding to ask sufficient questions to demonstrate whether she was hostile to the defense. If this hostility had been shown, he would have been in a position to have asked that the court call Mrs. Baxter as a court witness for cross-examination by defense counsel. However, this procedure was not adopted and accordingly defense counsel did not use Mrs. Baxter as a witness, hostile or otherwise. Not only was there no error committed in this respect, but there was no deprivation of any constitutional right of petitioner in this respect. Defendant had a constitutional right to call Mrs. Baxter as a witness and there is no showing that there was any interference by the state with the exercise of that right.

8. Petitioner again attacks his own confession which was introduced into evidence at the trial. In Miller v. Pate, 7 Cir., 300 F.2d 414, at 416, we said:

"It is in view of this lack of petitioner's credibility that we now consider his testimony to support his claim of coercion. From our own examination of the abstract of the entire state trial record submitted by petitioner to the district court, we are completely convinced that petitioner's confession was in no way a result of coercion. In this court the question of whether established primary facts underlying this confession prove that it was coerced or voluntary cannot rest on the decision of the Illinois Supreme Court. The

responsibility of answering the question now rests upon us. \* \* \*"

The present attack on the confession is that, in order to weaken petitioner's will, he was led to believe by his interrogators that a hair found in the body of the deceased matched his pubic hair.[9] The record shows however that he had demanded and was granted an opportunity to look at the hairs in a microscope room and that he stated "them hairs don't match" and "them hairs don't belong to me." Despite the fact that this matter of hair *was not heard by the jury*, counsel for petitioner in his brief now says, " \* \* \* when the jury heard it, the prosecution did not admit that a false statement had been made to petitioner. At no time did the prosecution deny that such statement had been made. Thus the jury was left to draw the false inference that in fact a hair matching petitioner's had been found in the body of the deceased."

We find no trick was perpetrated on petitioner in order to secure his confession.

9. Lastly, in this court petitioner's counsel attack the truth of certain parts of the confession. They profess to find some reasons for doubting the factual correctness of some of the facts set forth therein. The truth of petitioner's confession was a matter to be determined at the trial. Petitioner at his trial had an ample opportunity to submit evidence as to the alleged incorrectness of any of the facts set forth in his confession. In fact, he testified and in addition thereto introduced the testimony of twelve witnesses.

For all of the foregoing reasons, the order, judgment and decree of the district court entered December 24, 1963 is reversed and this cause is remanded to that court with directions to dismiss the petition.

Order, judgment and decree reversed and cause remanded with directions to dismiss petition.

---

9. See ante 651.