332 F.Supp. 360 (1971)
R. D. EVANS, Petitioner,
v.
Harold R. SWENSON, Warden, Missouri State Penitentiary, Jefferson City, Missouri, Respondent.
No. 71 C 315(3).
United States District Court, E. D. Missouri, E. D.
August 24, 1971.
*361 R. D. Evans, pro se.
John C. Danforth, Atty. Gen., State of Mo., Kenneth M. Romines, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

MEMORANDUM AND ORDER
WEBSTER, District Judge.
This matter is before the court on petition of R. D. Evans for writ of habeas corpus pursuant to 28 U.S.C. 2254. The petition was filed in the Western District of Missouri, Western Division on May 19, 1971. Leave was granted to proceed in forma pauperis and the cause transferred to this court by order filed May 19, 1971. This court entered show cause order on June 15, 1971. A response was filed on July 19, 1971. Petitioner filed a Traverse Of Response To Order To Show Cause and moved for appointment of counsel on July 20, 1971.
Petitioner is presently serving a life sentence in the Missouri State Penitentiary at Jefferson City, Missouri after a jury in the Circuit Court of the City of St. Louis found him guilty of first degree murder. Sentence was imposed on January 20, 1967. The Missouri Supreme Court affirmed the conviction on direct appeal (State v. Evans, 439 S.W. 2d 170 (1969)). Petitioner thereupon filed a motion to vacate sentence with the Circuit Court of the City of St. Louis pursuant to Supreme Court Rule 27.26, V.A.M.R. That court denied the motion on November 20, 1969. Petitioner appealed this decision and it was affirmed by the Missouri Supreme Court on April 12, 1971 (Evans v. State, 465 S.W.2d 500 (Mo., 1971)).
Petitioner's sole contention on appeal from the conviction was that the trial court had erroneously admitted into evidence his confession which he contends was obtained in violation of the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This same allegation formed the basis of petitioner's motion to vacate sentence pursuant to Rule 27.26 and his appeal from denial of that motion. In this proceeding, petitioner states:
"(a) The conviction and sentence under which petitioner is being held was imposed in violation of the Sixth Amendment and the Due Process clause of the Fourteenth Amendment to the United States Constitution, in that petitioner was deprived of his right to counsel during in-custody interrogation.
(b) The conviction and sentence under which petitioner is being held was imposed in violation of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment, in that petitioner was compelled to be a witness against himself by the admission into evidence at his trial of involuntary statements made by him while in custody."
Respondent concedes and this court finds that with regard to these allegations petitioner has exhausted all remedies available to him in Missouri courts as required by 28 U.S.C. 2254(b).
Petitioner moved to St. Louis, Missouri from Staubier, Mississippi in February, 1964. In that same month he met one Ernestine Bowers, a single woman who was then the mother of one child. On November 26, 1964 Miss Bowers gave birth to a second child she named Janet Denise Bowers. At the trial all testimony indicated that petitioner was the father. Sometime in January, 1965, petitioner and Ernestine Bowers moved into the home of Charles and Acymai Morgan, a four-room cottage located at the rear of 2820 Montgomery. In May or June of 1965 the couple moved with the two children into a house at the front of 2820 Montgomery and lived together there until April, 1966, when Ernestine Bowers moved with her children back into the Morgan's home. At trial, she testified that petitioner beat her and refused to give her money to buy food for the two children and that this was what caused her to leave him.
On Saturday evening, May 14, 1966, a group of about nine persons gathered at the Morgan house. Both petitioner and Miss Bowers had been invited and *362 were present. In the early evening, petitioner spoke to Miss Bowers about returning to him. Later an argument developed between him and Acymai Morgan over petitioner's relationship with Miss Bowers, and petitioner was asked to leave the house about midnight. The last of the other guests did not leave the premises until 3:45 A. M. Sunday morning. At approximately 4:15 A. M. the Morgan house caught on fire and was virtually destroyed. Janet Denise Bowers burned to death. The State's evidence tended to show that a can of gasoline had been thrown into the house through an open window and ignited.
Patrolman Dale F. Meyers of the St. Louis Metropolitan Police Department was dispatched to the scene of the fire. While the officer was giving aid to injured persons, Charles Morgan told him that petitioner had started the fire and gave the officer petitioner's description. Shortly thereafter, Meyers was seated in his patrol car at the corner of Montgomery and Leffingwell Streets diverting traffic. He saw petitioner emerge from a taxicab and approach the patrol car. The officer asked petitioner to identify himself and then took him to the scene of the fire. When they reached the scene, Officer Meyers accompanied petitioner to another patrol car where petitioner identified the body of the burned infant. Meyers and a Patrolman Robert Bommarito then took petitioner and the child's body to Homer G. Phillips Hospital, where she was pronounced dead. Meyers testified that he asked no questions of petitioner while they drove to the hospital. After the girl had been pronounced dead, Officer Bommarito drove the body to the City Morgue while Meyers waited with petitioner in the Emergency Room of the hospital for another car to pick them up.
At trial, Officer Meyers testified as to subsequent events as follows:
"Q Well, Officer, what did you next do?
A I stayed with Mr. Evans in the emergency room at the hospital.
Q Did you speak with him there?
A Yes, sir, I did.
Q And what, if anything, did he say to you?
A Well, he was crying and I had him by the arm and I said, I asked the gentleman where he had been and he said he had just come back from East St. Louis and I didn't speak much more with him, he kept on crying, and I said to the man, I said, you know, Mr. Morgan told me that you were the one that set fire to the house, and at first he said, no, that's not true, and I said, I'm just telling you what Mr. Morgan has said, and at that time he started crying again, and I got up to get a drink of water and he was still crying, and he said, when did Mr. Morgan tell you that, and I said, right after the fire; he said he had seen you throw the fire bomb inside, and he stated, rather, he started crying again, and he said, well, Officer, I got something to say to you 
MR. GRAY: Your Honor, may we approach the bench?
THE COURT: Yes, of course.
(The following proceedings took place at the bench, out of the hearing of the jury, between counsel and the Court:)
MR. GRAY: Now, Your Honor, at this time the witness is going to testify that Mr. Evans said he set the house on fire and I want to object to it at this time becausefor the reason that at this time Mr. Evans had not been apprised of his rights and he was not arrestedhe didn't say he advised him.
THE COURT: What rights need he been apprised of, Mr. Gray?
MR. GRAY: At this point he is merely talking to him at the City Hospital and I think that the officerhe is a law school studentand he will testify that he gave him certain admissions and I think he told him what happened and I don't think he advised him of anything prior to this.
THE COURT: Well, I'll sustain the objection with leave to lay a further foundation.
*363 (At this point, the trial was resumed within the hearing of the jury, as follows:)
Q (By Mr. Lane) Now, Officer, this conversation with R. D. Evans took place in the emergency room at the City Hospital No. 2?
A I wouldn't say the emergency room, exactly, this is a waiting area for people and that's where it was.
Q At that time, were you waiting to go back over to the District station?
A Yes, sir; I called my Sergeant and told him that I had no way of getting back to the station.
Q Then, you stated this man, R. D. Evans, went to get a drink of water
A No, sir, I did; Mr. Evans stayed thereI went to get the drink of water.
Q And then, when he came back, did he speak to you?
A You mean when I came backis that what you mean, when I came back from getting a drink of water?
Q Yes.
A Well, yes, sir; he was crying and he asked me a question, he saidI can't remember the exact wordsbut something like when did I, or Charlie tell you that I threw the fire bomb in the house and I said, he told me at the scene, at the fire, and he just started crying again, and he just sat there for about five minutes, or ten, crying, and then he looked up and he said, Officer, I would like to tell you something.
Q And at this time, what, if anything, did you say to him?
A Well, I said, well, I want to tell you something before you say anything at all to me. I said, I want to tell you about the rights you have as a citizen of the United States, and he just looked at me and I said, you realize you don't have to say anything and you don't have to make any statement, and, now, any statement you do make could be used against you, and I said, do you understand it, and he nodded, and I said that, you know you have a right to make a phone call and you also have a right to an attorney and he said, I know that. I said, if you don't have an attorney or can't afford one, I'll get one for you. I said, now, do you understand all of this and he said, yes, he did understand that, and he got a little bit short, and he said, I'm not stupid, and I said, I'm not insulting your intelligence; I just want you to understand you have certain rights and to see that they're protected, and he said, I understand that very well, and I said, all right, what do you want to say to me? He started crying again, I'd say, oh, ten minutes
(The following proceedings took place at the bench, out of the hearing of the jury, with counsel and the Court:)
MR. GRAY: Your Honor, he has never said yet that this man was under arrest and being charged with this felony.
THE COURT: It doesn't make any difference whether he is under arrest or not, in view of the officer's testimony.
MR. GRAY: Well, I believe that he was terribly upset; he acknowledged he had seen this child burned and I'm not sure he understood what the officer was saying to him.
THE COURT: The officer said he said he understood it. Overruled. That goes to the weight and the officer said that he said he understood it.
(At this point, the trial was resumed within the hearing of the jury, as follows:)
Q (By Mr. Lane) Now, you did advise him, did you advise him of these rights and then he started crying, is that what you said?
A Yes, sir.
Q And then what happened next what did he tell you?
A Well, he didn't say anything more for about six or seven minutes, and then I said to him, Mr. Evans, did you want to say something to me? And he kept on crying for about, oh, five or six minutes more, and he just kept saying, my baby, my baby, and I said, would you like to have somebody here to talk to, *364 and he said, no, I guess I better tell you, and I said, all right, what did you do, and he said, I burned up my baby, and I said, well, that was terrible, I said, why did you do a nutty thing like that for, and he said he didn't mean to burn up his child, all he wanted to do was to get even with his wife for going out on himhe said he had warned her on several occasions and that he was tired of this and the next time it happened, he told her, she was going, tooand I said, didn't you realize that you might hurt somebody else, and at that time, I said, well, Mr. Evans, I'm going to place you under arrest on suspicion of arson and homicide * * *."
Thereafter, petitioner was taken to the Fifth District police station where he was questioned by Detectives George Fritsche and Detective Lester Ficke. Fritsche testified that prior to questioning he told petitioner that anything petitioner said could be used against him in court and that there was a phone available if he wanted to call anyone. The officer then testified that petitioner admitted setting the fire because he was mad at his common law wife for refusing to live with him. Officer Fritsche, Officer Ficke, Acymai Morgan and Ernestine Bowers testified that subsequently Mrs. Morgan and Miss Bowers were brought into the room where petitioner was being questioned and, after petitioner had again been warned that he had the right to remain silent and that anything he said might be used against him, he repeated this confession in the presence of the four of them. Later on the same morning, petitioner was taken to Central Police Headquarters to meet with Melroy B. Hutnick, an attorney with the Circuit Attorney's office for the City of St. Louis. Hutnick testified at trial that before speaking with petitioner he warned him that he did not have to make any statement and that any statement he might make could be used against him at trial, that he had the right to be represented by a lawyer, that he could make a phone call to get a lawyer and that if a lawyer were present, he would probably tell petitioner not to make any statement. Hutnick testified that petitioner thereupon confessed to setting the fire to him.
At trial petitioner denied making any confessions of guilt, denied that he was warned of his right to an attorney and to remain silent and further testified that police threatened him while he was being questioned.
In affirming the conviction on direct appeal, the Missouri Supreme Court, citing State v. Price, 422 S.W.2d 286 (Mo., 1968), held that because petitioner had not specifically stated his objections to the admission of the confession evidence at trial, he had failed to preserve the point for review. On appeal from denial of relief under petitioner's motion to vacate sentence under Rule 27.26, the Supreme Court of Missouri again held that petitioner's failure to object specifically to the admission of the confession evidence precluded review of the point in that court.
Ordinarily the question of admissibility of evidence is considered to be a matter of state law not reviewable in a federal habeas corpus proceeding. Durham v. Hayes, 368 F.2d 989 (8th Cir. 1966), cert. denied, 390 U.S. 959, 88 S. Ct. 1054, 19 L.Ed.2d 1154 (1968); Atwell v. State of Arkansas, 426 F.2d 912 (8th Cir. 1970); Wilson v. Nebraska, 316 F.2d 84 (8th Cir. 1963). However, where the invasion of fundamental federal rights is asserted, state procedural rules will not preclude examination by federal courts on petition for writ of habeas corpus. Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 8 L.Ed. 166 (1941); United States ex rel. Cannon v. Maroney, 373 F.2d 908 (3rd Cir. 1967); State ex rel. Koalska v. Swenson, 217 F. 2d 66 (8th Cir.) (1954); Pineda v. Craven, 424 F.2d 369 (9th Cir. 1970).
Under the Supreme Court's decision in Miranda v. Arizona, supra, prior to subjecting any suspect to in-custody interrogation, police are required to warn him (1) that he has the right to remain silent, (2) that any statement that he *365 does make will be used against him in a court of law, (3) that he has the right to consult an attorney and have one present during interrogation and (4) that if he cannot afford an attorney and desires one, one will be appointed him. If such warnings are not given, any statements elicited from one in custody may not be used against him at trial. Police warnings must contain all four of the elements enumerated above before the inherent pressures associated with police questioning may be considered by a court of law to have been overcome. It is not sufficient if a warning contains some but not all of these elements. Fendley v. United States, 384 F.2d 923 (5th Cir. 1967); United States v. Fox, 403 F.2d 97 (2d Cir. 1968); Groshart v. United States, 392 F.2d 172 (9th Cir. 1968); Lathers v. United States, 396 F. 2d 524 (5th Cir. 1968).[*] Although all four elements must be present in police warnings, particular language is not required so long as a suspect is able to understand the substance and the importance of what is being said. United States v. Vanterpool, 394 F.2d 697 (2d Cir. 1968); Camacho v. United States, 407 F.2d 39 (9th Cir.), cert. denied, 396 U.S. 944, 90 S.Ct. 380, 24 L.Ed.2d 245 (1969); Sweeney v. United States, 408 F.2d 121 (9th Cir. 1969); Craft v. United States, 403 F.2d 360 (9th Cir. 1968).
At trial, Officer Meyers testified that he apprised petitioner of his right to counsel and of his right to remain silent before petitioner said anything regarding the fire. Specifically, Meyers testified that he told petitioner, "you don't have to say anything and you don't have to make any statement", also that "any statement that you do make could be used against you," that "you have a right to make a phone call and a right to an attorney" and that "if you don't have an attorney or can't afford one, I'll get one for you." The officer testified that he paused twice while giving these warnings to ask petitioner if he understood what was being said and that petitioner answered in the affirmative.
It is true that Meyers did not specifically tell petitioner that petitioner could consult counsel before answering questions. Rather, he told petitioner that he did not have to "say anything" or "make any statement". He used words that clearly conveyed the existence of an absolute right to remain silent whether petitioner chose to accept aid of counsel or not. The court finds Officer Meyers' warnings sufficient to have apprised petitioner of his right to remain silent. The court also finds no reason to doubt that petitioner understood what was being said to him. Meyers advised petitioner that "If you don't have an attorney or can't afford one, I'll get one for you." Meyers' words conveyed the idea that petitioner had the right to consult with someone, other than a policeman, who was versed in the law and who would advise him of his legal rights. Any offer of appointed counsel accomplishes little more, since by definition, such counsel cannot be of the suspect's own choosing.
The court therefore concludes that the warnings given petitioner by Officer Meyers as to his right to remain silent and as to his right to counsel satisfied the requirements of Miranda in all respects and that petitioner had been sufficiently apprised of his rights before he voluntarily confessed to Officer Meyers that he had started the fire.
Warnings given petitioner immediately prior to subsequent confessions made in the presence of detectives Fritsche and Ficke, Acymai Morgan, Ernestine Bowers and Melroy Hutnick may have been inadequate under Miranda, as it does not appear that any of these later warnings contained all of the four elements required. The question arises as to whether *366 it was improper to introduce testimony by these witnesses regarding confessions at trial. This court holds, under all facts, that it was not.
That adequate warnings are not given a suspect at the beginning of the questioning session in which incriminating statements are elicited does not render those statements inadmissible if the suspect has previously been given adequate warnings and it is possible to determine that the statements were made voluntarily. United States v. Vanterpool, 394 F.2d 697 (2d Cir. 1968); United States v. Osterburg, 423 F.2d 704 (9th Cir.), cert. denied, 399 U.S. 914, 90 S.Ct. 2166, 26 L.Ed.2d 571 (1970); Miller v. United States, 396 F.2d 492 (8th Cir. 1968). Officer Meyers' adequate warnings had been given only a few hours before petitioner confessed before the other witnesses. They cannot be considered stale through passage of time. Though the subsequent warnings may have been inadequate under the strict requirements of Miranda, they were sufficient to indicate to petitioner that he should be cautious in what he said. That petitioner repeated his statements to the police before his friends and acquaintances is further evidence that his confessions were voluntary. The court concludes that the record of petitioner's trial adequately supports a finding that petitioner's subsequent incriminating statements were voluntary, did not result from prior admissions illegally obtained, and that their introduction into evidence at petitioner's trial was not improper.
At the trial, petitioner took the stand and denied making any confessions, and testified as to alleged police threats. It should be noted that habeas corpus will not lie to question the sufficiency of evidence supporting a conviction unless there is such an absence of evidence that the conviction violates the Due Process clause of the Fourteenth Amendment. Mathis v. People of the State of Colorado, 425 F.2d 1165 (9th Cir. 1970); Martinez v. Patterson, 371 F.2d 815 (9th Cir. 1966); Hall v. Crouse, 339 F.2d 316 (10th Cir. 1964), cert. denied, 381 U.S. 941, 85 S.Ct. 1777, 14 L.Ed.2d 704 (1965); Faust v. State of North Carolina, 307 F.2d 869 (4th Cir. 1962), cert. denied, 371 U.S. 964, 83 S.Ct. 547, 9 L.Ed.2d 511 (1963). Nor will matters of credibility be tested on habeas corpus. Trujillo v. Tinsley, 333 F.2d 185 (10th Cir. 1964); Judy v. Pepersack, 284 F.2d 443 (4th Cir. 1960), cert. denied, 366 U.S. 939, 81 S.Ct. 1667, 6 L.Ed.2d 850 (1961), United States ex rel. Rooney v. Ragen, 173 F.2d 668 (7th Cir.), cert. denied, 337 U.S. 961, 69 S.Ct. 1524, 93 L.Ed. 1759 (1949). Whether petitioner's testimony at the trial in which he denied making the confessions effectively waived the protection of Miranda (cf. Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)), we need not decide in view of our holding, supra.
Accordingly, it is hereby ordered that petitioner's motion for appointment of counsel will be and is hereby denied.
It is further ordered that petition for writ of habeas corpus will be and is hereby denied.
NOTES
[*] See, however, United States v. Messina, 388 F.2d 393 (2d Cir.), cert. denied, 390 U.S. 1026, 88 S.Ct. 1413, 20 L.Ed.2d 283 (1968) where the Court of Appeals for the Second Circuit held that failure to advise suspects of their right to appointed counsel if they were indigent would not render otherwise proper warnings invalid where suspects were in fact not indigent.